CC-1998-324                    1

En el Tribunal Supremo de Puerto Rico

| Unión de Trabajadores de la Industria Eléctrica y Riego, etc. Recurridos V. Autoridad de Energía Eléctrica, etc. Peticionarios | Certiorari 99 TSPR 155 |
| --- | --- |

Número del Caso: CC-1998-0324

Abogados de la Parte Peticionaria: Lcdo. Roberto Corretjer Piquer
                                   Lcdo. Juan Villafañe López

Abogado de la Parte Recurrida:     Lcdo. José Velaz Ortiz

Tribunal de Primera Instancia, Sala Superior de San Juan

Juez del Tribunal de Primera Instancia: Hon. Carmen Rita Vélez Borrás

Tribunal de Circuito de Apelaciones: Circuito Regional I

Panel Integrado por:      Hon. Fiol Matta
                          Hon. Rodríguez de Oronoz
                          Hon. López Vilanova

Fecha: 10/13/1999

Materia: Derecho Constitucional

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Unión de Trabajadores de la
Industria Eléctrica y Riego,
Etc.

       Recurridos

        vs.                    CC-1998-324    Certiorari

Autoridad de Energía Eléctrica;
Cordero, Etc.

       Peticionarios


Opinión del Tribunal emitida por el Juez Asociado señor FUSTER BERLINGERI.

San Juan, Puerto Rico, a 13 de octubre de 1999.


Al amparo de la disposición constitucional que prohíbe la interceptación de las comunicaciones telefónicas, nos toca dilucidar la validez de un sistema de auditoría de llamadas por teléfono.


I

Los hechos pertinentes a la controversia del caso de autos fueron estipulados por sus partes, y dicha estipulación fue acogida por el foro de instancia como sus determinaciones de hechos. Conforme a tales determinaciones, los recurridos, que comparecieron por sí mismos algunos y otros representados por la Unión de Trabajadores de la Industria Eléctrica y Riego (UTIER), al iniciarse el pleito eran o habían sido

empleados de la Autoridad de Energía Eléctrica de Puerto Rico (A.E.E.). Como empleados se desempeñaban en el Centro de Servicios al Cliente (Centro) de la A.E.E. Se dedicaban a atender las llamadas telefónicas de aquellos clientes de la A.E.E. que se comunicaban con dicha entidad para conversar sobre determinados asuntos, tales como quejas sobre los servicios recibidos de la A.E.E., problemas de facturación excesiva o pagos no acreditados, desganche de árboles que interferían con el tendido eléctrico, apagones, emergencias, contadores defectuosos, hurto de servicios y otros. Los empleados referidos, quienes rendían sus labores en calidad de "representantes de servicio al cliente", tenían asignados al azar determinadas unidades de teléfono del cuadro telefónico de la A.E.E., destinadas al tipo de llamadas en cuestión.

Al comenzar a laborar en el Centro en enero de 1993, la A.E.E. les comunicó a los empleados recurridos que, como parte de sus funciones, estarían integrados a un sistema de auditoría de las llamadas telefónicas que ellos atendiesen. Se les indicó a estos empleados que mediante el sistema aludido unos supervisores podrían escuchar las conversaciones de dichos empleados con los clientes que llamasen a la A.E.E. El sistema referido se utilizaría a discreción de los supervisores y sin el consentimiento del empleado. Los supervisores escucharían las llamadas en cuestión con el fin de evaluar la calidad de los servicios prestados por los empleados y para determinar si requerían adiestramiento; para mejorar tales servicios; y para la reclasificación de plazas de empleo.

En julio de ese mismo año, la A.E.E. le informó a los empleados referidos que las llamadas personales a través del cuadro telefónico del Centro estaban prohibidas; y que para hacer llamadas personales, los empleados debían utilizar otros teléfonos designados para ello, que los supervisores no podían escuchar.

Debe destacarse que inicialmente los clientes que llamaban a la A.E.E., pero que tenían que esperar en línea para ser atendidos, recibían el siguiente aviso o mensaje grabado:

> Para mejorar la calidad del servicio, su llamada será escuchada por un supervisor. Cualquier duda, si necesita, solicite la atención de un supervisor.

Por otro lado, los clientes que eran atendidos inmediatamente, no recibían un mensaje previo que les informase sobre la posibilidad de que su llamada fuese escuchada por un supervisor, en cuyo caso dicha llamada podía ser escuchada por éste sin que el cliente supiera de ello. Sin embargo, a partir del 21 de agosto de 1995 todos los clientes que llamaban a la A.E.E. siempre recibían el siguiente aviso o mensaje:

> Para poder brindar un mejor servicio, un supervisor podría estar escuchando su llamada.

Por razón de su inconformidad con el sistema de auditoría aludido, el 17 de noviembre de 1993 varios empleados y antiguos empleados de la A.E.E. incoaron una causa de acción[1] en contra de la antedicha corporación pública. Alegaron, *inter alia*, que sus derechos constitucionales y los de los clientes de la A.E.E., al amparo de la Sección 10, Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico, estaban siendo violados por el sistema de auditoría de llamadas de la A.E.E. Luego de los procedimientos de rigor, el 7 de noviembre de 1996 el Tribunal de Primera Instancia emitió una sentencia parcial y en lo pertinente determinó que el sistema de auditoría en cuestión era contrario al derecho de los clientes y de los empleados de la A.E.E. a que no se interceptarán sus comunicaciones telefónicas sin su consentimiento. Resolvió de modo expreso "que la instalación de un mecanismo de auditoría de llamadas telefónicas por los funcionarios de la [A.E.E.]... constituyó una actuación inconstitucional." Inconforme con tal dictamen, el 12 de diciembre de 1996 los peticionarios--la A.E.E., los supervisores demandados y otros--presentaron una solicitud de certiorari ante el Tribunal de Circuito de Apelaciones. El 30 de marzo de 1998 dicho foro confirmó la sentencia apelada y adoptó por referencia los fundamentos expuestos en ésta. Por estar en desacuerdo

---

[1] "Petición de Injunction Preliminar y Permanente, Sentencia Declaratoria, Daños y Perjuicios, Derechos Constitucionales, Derechos Civiles".

también con este otro dictamen, los peticionarios acudieron ante nos y señalaron la comisión de los siguientes errores:

1. Erró el Tribunal de Circuito de Apelaciones al adoptar por referencia los fundamentos del Tribunal de Primera Instancia y no resolver en sus méritos la novel cuestión constitucional que envuelve el caso de marras, pasando por alto el historial constitucional de la cláusula sobre interceptación de llamadas telefónicas.

2. Erró el Tribunal de Circuito de Apelaciones al negarse a revisar la determinación del Tribunal de Primera Instancia que declaró que la instalación de un mecanismo de auditoría de llamadas telefónicas por los funcionarios de la A.E.E. en el Centro de Servicios al Cliente de dicha corporación pública constituye una actuación inconstitucional violadora de lo dispuesto en las secciones 1, 8 y 10 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico. Erró además el Tribunal de Circuito de Apelaciones al negarse a entender en la cuestión constitucional sustancial que envuelve la acción de epígrafe.

3. Erró el Tribunal de Circuito de Apelaciones al negarse a revisar la determinación del Tribunal de Primera Instancia que resuelve que los recurridos son "parte" en la comunicación telefónica con derecho a albergar una expectativa razonable de intimidad en las llamadas que se reciben en el Centro de Servicios al Cliente, cuando las llamadas están dirigidas a la A.E.E. y se relacionan con los servicios esenciales que dicha corporación pública tiene que prestar, por mandato expreso de ley.

4. Erró el Tribunal de Circuito de Apelaciones al negarse a revisar la determinación del Tribunal de Primera Instancia que determinó que la A.E.E. es un tercero que intercepta las llamadas telefónicas que se dirigen a dicha corporación pública bajo la protección constitucionalmente reconocida, obviando el hecho de que la A.E.E. es parte en la comunicación y es a ésta que va dirigida la llamada telefónica, que se recibe en un número telefónico asignado a la A.E.E., el cual está conectado a un cuadro telefónico propiedad de dicha corporación pública y el que es atendido por los empleados de la A.E.E. Constituye un error del Tribunal negarse a revisar la determinación del Tribunal de Primera Instancia que determinó que la A.E.E. la práctica era ilegal, cuando el número telefónico en cuestión está dedicado único y exclusivamente a recibir llamadas a la A.E.E. en solicitud de servicios y/o para reportar querellas. Dicho número telefónico se contesta por empleados allí asignados al azar y la Autoridad les provee a dichos empleados otros teléfonos no sujetos al sistema de monitoreo para que éstos puedan hacer y recibir llamadas personales o de aquél tipo donde puedan tener una expectativa de privacidad."

El 30 de junio de 1998, expedimos el recurso solicitado a los fines de resolver las cuestiones planteadas por los peticionarios y pautar las

normas aplicables a la importante y novel cuestión constitucional ante nos. El 14 de septiembre de 1998 la parte peticionaria sometió su alegato, y el 2 de noviembre de ese año la parte recurrida sometió el suyo. Con el beneficio de ambas comparecencias, pasamos a resolver.

II

Según hemos indicado antes, "la sección 8 de la Carta de Derechos (Art. II) de la Constitución del Estado Libre Asociado de Puerto Rico dispone que toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar. Esta sección junto con el principio de inviolabilidad de la dignidad del ser humano contenida en la primera sección del referido Artículo es la fuente en nuestro ordenamiento jurídico del derecho a la intimidad, derecho fundamental que goza de la más alta jerarquía en nuestro entramado de derechos constitucionales." Pueblo v. Santiago Feliciano, opinión del Tribunal de 14 de noviembre de 1995, 139 D.P.R. ___, 95 J.T.S. 154. Este derecho opera *ex proprio vigore* y puede hacerse valer aun entre personas privadas. Arroyo v. Rattan Specialties, Inc., 117 D.P.R. 355, 64 (1986); Colón v. Romero Barceló, 112 D.P.R. 573, 576 (1982); Figueroa Ferrer v. E.L.A., 107 D.P.R. 250, 259 (1978); E.L.A. v. Hermandad de Empleados, 104 D.P.R. 436, 440 (1975); Alberio Quiñonez v. E.L.A., 90 D.P.R. 812, 816 (1964); González v. Ramírez Cuerda, 88 D.P.R. 125, 133 (1963).

También hemos resuelto que como parte integral del referido derecho a la intimidad, la Sección 10 del Art. II de nuestra Constitución dispone que "no se interceptará la comunicación telefónica." El derecho de una persona a que no se le intercepten sus comunicaciones telefónicas es parte esencial del derecho a la intimidad; Pueblo v. Colón Rafucci, Op. del Tribunal del 25 de enero de 1996, 139 D.P.R. ____, 96 JTS 10; P.R. Tel. Co. v. Martínez, 114 D.P.R. 328 (1983). **Es una manifestación específica de éste**. P.R. Tel. Co. v. Martínez, supra, a la pág. 341. La Sección 10 aludida "responde a la intención específica de vedar, sin

lugar a dudas, la intromisión no consentida en las comunicaciones telefónicas." Id, a la pág. 340. El mandato constitucional respecto a la protección de la intimidad en las llamadas telefónicas es tajante. Id, a la pág. 341. Está formulado en el lenguaje más limitativo, y se trata de una prescripción que exige celoso cumplimiento. Id, a la pág. 336. Se trata de un mandato constitucional que es aún más riguroso que el que se refiere al derecho fundamental a la protección de la intimidad de las personas contra requisitos y allanamientos irrazonables porque, como señaláramos en Pueblo v. Santiago, supra, la prescrita interceptación de la comunicación telefónica no se permite **ni aun mediante orden judicial**. "La comunicación telefónica ocupa un lugar particularísimo dentro del esquema establecido en la Sección 10, que no se extiende a comunicaciones de otra índole", Pueblo v. Santiago, supra. La garantía constitucional en contra de la interceptación telefónica, pues, no puede obviarse, "a menos que medie el consentimiento de sus titulares." Id.

El propósito central de la prohibición de la Sec. 10 referida es proteger la secretividad de la conversación telefónica. 3 Diario de Sesiones de la Convención Constituyente de Puerto Rico, pág. 1586 (1961). Se busca asegurar que lo conversado entre la persona que origina una llamada telefónica y la persona destinataria de esa llamada quedará entre ellos. La interceptación prohibida ocurre de ordinario cuando un tercero, extraño a la comunicación voluntaria entre las dos partes aludidas, escucha, se inmiscuye o divulga tales conversaciones por cualesquier medios. Pueblo v. Colón Rafucci, supra, a la pág. 619; P.R. Tel. Co. v. Martínez, supra, a las págs. 342-343, y 347.

Para que la interceptación telefónica pueda permitirse lícitamente, se requiere que las dos partes protegidas renuncien a su derecho. Hemos resuelto antes que se trata de un derecho renunciable. P.R. Tel. Co. v. Martínez, supra, a la pág. 343. Pero tal renuncia, para ser válida y eficaz, tiene que ser "patente, específica e inequívoca". Id. Cómo ocurre con todas las renuncias a los derechos constitucionales

fundamentales, la renuncia debe ser clara, voluntaria, y efectuada con pleno conocimiento de causa. Pueblo v. Morales, 100 D.P.R. 436 (1972). Además, "no es suficiente la renuncia de una sola parte para convalidar, ipso jure, una interceptación telefónica. Es menester que se configure una renuncia **bilateral**. . .", P.R. Tel. Co. v. Martínez, supra, a la pág. 342. Si no están presentes las renuncias aludidas, el Estado y cualquier persona o entidad particular están impedidos, sin excepción, de interceptar o permitir que se escuche una comunicación telefónica. Id, a la pág. 343.

A la luz de esta bien establecida normativa constitucional, pasemos a considerar la situación particular ante nos en el caso de autos.

III

Es menester comenzar nuestro análisis resaltando que tenemos ante nos una situación que es distinta de la instancia común a la que aplica el derecho garantizado por la Sec. 10 referida. La prohibición de la interceptación telefónica se refiere de ordinario a la conversación entre dos personas humanas. Como se ha señalado antes, la Sec. 10 referida pertenece a la esfera del derecho que persigue proteger la intimidad **de la vida privada o familiar**. P.R. Tel. Co. v. Martínez, supra, a la pág. 338 y 340. En lo más fundamental, lo que se busca proteger es la inviolabilidad y dignidad **del ser humano**. Id, a la pág. 344. Por eso, hemos resuelto expresamente que el derecho en cuestión "presupone y se extienda únicamente a conversaciones ...[realizadas]... en el curso ordinario **de las relaciones bilaterales humanas**..." Id, a la pág. 344.

En el caso de autos, las llamadas en cuestión siempre tenían como destinatario a una entidad corporativa. La parte que originaba la comunicación telefónica llamaba a la A.E.E. para discutir algún asunto referente al servicio que presta la A.E.E., que es una persona jurídica. No se trataba, pues, de la situación ordinaria referente al derecho en cuestión, que usualmente involucra llamadas entre dos personas

naturales. En este contexto, los peticionarios alegan que los dictámenes impugnados por ellos son erróneos porque los empleados recurridos no eran los destinatarios del derecho constitucional de intimidad que invocaron. Aducen que las llamadas telefónicas en cuestión iban dirigidas a la propia A.E.E. como parte receptora y no a los empleados recurridos como tal. Enfatizan que los empleados en cuestión eran sólo un instrumento o canal de la A.E.E. para contestar las llamadas telefónicas que los clientes de dicha entidad le hacían a ésta. Señalan que como las llamadas referidas no se le hacían a los empleados de la A.E.E. en su carácter personal, la parte con interés real en tales llamadas era la propia A.E.E., a quien dichas llamadas iban dirigidas. Concluyen que la A.E.E. no puede haber incurrido en una interceptación de comunicaciones telefónicas, debido a que las comunicaciones en cuestión eran llamadas a la propia A.E.E.

Es evidente que los peticionarios tienen razón en cuanto a que la A.E.E. era una de las dos partes en las llamadas telefónicas que nos conciernen aquí. Los clientes que llamaban a la A.E.E. para alguno de los fines antes reseñados ciertamente no tenían interés alguno en conversar con uno u otro empleado particular de la A.E.E. Si acaso, su interés era el de hablar con un funcionario de la A.E.E. que tuviese la autoridad necesaria para resolver el asunto que motivó su llamada, por lo que debe suponerse que preferirían hablar con un supervisor, más que con sólo un "representante de servicio". Es claro que las llamadas en cuestión las hacían los clientes aludidos para tratar algún asunto con la A.E.E. en sí y el empleado que las atendía era sólo el **conducto** para el cliente traer a la atención de la A.E.E. el asunto concernido. Como la llamada del cliente que el empleado de la A.E.E. recibía no iba dirigida a éste en su carácter personal sino sólo como empleado de la A.E.E., no cabe duda alguna de que la otra parte en dicha llamada no era el empleado en sí sino la propia A.E.E. Es obvio que una entidad corporativa como la A.E.E., que es una persona jurídica, sólo puede actuar a través de sus empleados, sean estos "representantes de

servicio" o "supervisores". Unos y otros recibían las llamadas de los clientes a nombre y en representación de la A.E.E. Actuaban por la A.E.E. En términos operacionales, los empleados aludidos eran la A.E.E. En este sentido, daba igual hablar con un "representante de servicio" que hablar con un supervisor, como podía ocurrir a veces, porque en uno u otro caso con quien se hablaba era con la A.E.E. No tendría ningún sentido suponer que la conversación del cliente con un supervisor que interviniece en la llamada era esencialmente distinta a la conversación habida con el representante de servicio, debido a que en ambos casos la comunicación era realmente con la A.E.E.

Por otro lado, debe tenerse en cuenta que recientemente, en Pueblo v. Colón Rafucci, supra, resolvimos que cuando un agente de la Policía atiende una llamada hecha a un teléfono perteneciente al Estado, el Estado es la parte en la llamada y el agente actúa sólo como su representante. Por analogía, a igual conclusión debemos llegar en el caso de autos respecto a la A.E.E. y sus empleados. Resolvemos, pues, que en la situación de autos, la parte **receptora** en las llamadas telefónicas en cuestión, la que jurídicamente recibía tales llamadas, era la A.E.E. y no los empleados por conducto de los cuales dicha entidad actuaba.

Lo anterior significa que en la situación concreta que aquí nos concierne los recurridos, **como empleados de la A.E.E.**, no eran titulares del derecho que establece la Sección 10 del Artículo II de nuestra Constitución. Al atender las llamadas cursadas a la A.E.E., **no estaba en riesgo alguno su propia intimidad como personas**. Como **no** se trataba de llamadas **personales** de los empleados, no puede decirse que éstos tenían un derecho de intimidad del Art. II, Sección 10 de nuestra Constitución que les fuera violado. El trabajo que tenían estos empleados era precisamente el de recibir las llamadas que los clientes les hacían a la A.E.E., para resolver el asunto que el cliente planteaba si el empleado podía hacerlo por su cuenta, o para referirlo a otros funcionarios de la A.E.E. cuando ello fuera necesario. El asunto

conversado por el empleado, pues, no sólo nada tenía que ver con la vida privada o familiar de éste sino que, por su propia naturaleza, era uno que dicho empleado probablemente tenía que divulgar a otros en la empresa. No aplica a esta situación el mandato constitucional de que no se interceptará las llamadas telefónicas de las personas humanas.[2]

Debe notarse, además, que en lo único que podía afectar personalmente a los empleados recurridos el sistema de auditoría que aquí nos concierne, era en la evaluación de su trabajo. La A.E.E. obtenía de dicho sistema información sobre el desempeño laboral de sus empleados. Pero ello no presenta un problema jurídico relativo a lo que está ante nuestra consideración en este caso, que es la protección a la intimidad de la persona en llamadas telefónicas. Los empleados recurridos podrían tener cuestiones jurídicas válidas sobre si dicho tipo de supervisión estaba previsto en los términos de empleo acordados por ellos con la A.E.E., o en cuanto a si estaba o debió estar autorizado en el convenio colectivo de la A.E.E. con la UTIER, u otras. Podrían incluso haber problemas de intimidad si el patrono, en este caso la A.E.E., divulga la información obtenida sobre el desempeño laboral de los empleados a terceras personas, o más allá de lo necesario para propósitos legítimos del patrono. Véase, L. Brunn, Privacy and The Employment Relationship, 25 Houston Law Rev. 389 (1988). Ello no se ha planteado en el caso de autos. **Nada de lo anterior está ante nuestra consideración ahora**, en vista de que lo que se ha impugnado aquí no es una cuestión de relaciones obrero-patronales, ni del uso indebido por el patrono de la información obtenida por los supervisores, sino sólo sobre la validez constitucional en sí del sistema de auditoría referido, al amparo de la prohibición de la interceptación telefónica dispuesta en la Sección 10, Artículo II de nuestra Constitución. No hay nada en el

---

[2] Más aún, los empleados referidos sabían al asignársele sus labores que las llamadas podían ser escuchadas por sus supervisores. Conocía del sistema de auditoría de antemano, por lo que tampoco no podían tener una expectativa de intimidad respecto a ello. Véase, Simmons v.

historial de esa disposición, o en nuestros pronunciamientos sobre el particular, que permitan suponer que la prohibición de la interceptación telefónica ordenada por la referida Sección 10, Artículo II de la Constitución, persigue proscribir la supervisión patronal del desempeño laboral de los empleados en la situación particular que aquí nos concierne. No se estableció la prohibición constitucional en cuestión con el propósito de evitar que un patrono verifique si sus empleados atienden bien las llamadas telefónicas que por su conducto los clientes le hacen al patrono. En este aspecto no hay propiamente involucrado un derecho a la intimidad. Reiteramos, por tanto, que a los empleados recurrentes como tal no se les ha violado su derecho a no sufrir la interceptación indeseada de sus comunicaciones telefónicas, debido a que en la situación del caso de autos no están involucradas comunicaciones telefónicas que sean propiamente suyas.

IV

Lo anterior, claro está, no concluye nuestro examen del asunto ante nos. Como señaláramos antes, los recurridos impugnaron la validez constitucional del referido sistema de auditoría de llamadas telefónicas no sólo al amparo del alegado derecho propio como empleados de la A.E.E. a no sufrir la interceptación indeseada de sus comunicaciones telefónicas, **sino además al amparo de su alegado derecho como clientes de la A.E.E. a no sufrir tal interceptación**. La parte recurrida estaba integrada no sólo por empleados de la A.E.E. sino también por antiguos empleados de ésta. Los recurridos que estaban empleados aún por la A.E.E. eran además clientes de la empresa, por lo que demandaron en su carácter dual de empleados y **clientes**. Los recurridos que ya no eran empleados de la A.E.E. comparecieron sólo como abonados o clientes de ésta. **Unos y otros alegaron específicamente haberse visto afectados en su carácter de abonados** por las prácticas de la A.E.E. impugnadas en el

_Southwestern Bell Tel. Co._, 452 F. Supp. 392(1978), Aff'd 611 F2d 342 (1979).

caso de autos. Adujeron haber sufrido la supuesta intercepción telefónica en llamadas propias que originaron desde sus hogares en calidad de abonados.

En vista del referido planteamiento de los recurridos, el foro de instancia resolvió expresamente que el sistema de auditoría de llamadas telefónicas en cuestión violaba el derecho a la intimidad de los **clientes** de la empresa. En el dictamen aludido, que fue confirmado por el foro apelativo en su totalidad, se decretó que la interceptación en cuestión violaba tanto los derechos de los empleados recurridos como **los de los clientes de la A.E.E.** Debemos, pues, examinar ahora esta otra parte del dictamen aludido, que se refiere a la supuesta violación del derecho de los clientes o abonados de la A.E.E. a no sufrir la interceptación telefónica que prohibe nuestra Constitución.[3]

V

Nos toca examinar ahora si el sistema de auditoría impugnado en el caso de autos constituía una interceptación no consentida de las llamadas telefónicas de los clientes de la A.E.E. Estos clientes eran los que hacían u originaban las llamadas a la A.E.E. Eran la otra parte en la comunicación telefónica bilateral referida. Estos clientes de la A.E.E. **sí son titulares** del particularísimo derecho consagrado en la Sección 10 del Art. II de nuestra Constitución que de manera tajante prohíbe que se pueda interceptar sus llamadas telefónicas sin su previo consentimiento.

Como se ha señalado ya, para que exista una **"interceptación"** de la comunicación telefónica entre las dos partes de tal comunicación, usualmente es necesario que exista un **tercero** que es quien intercepta la comunicación. La interceptación ocurre de ordinario cuando tal tercero, extraño a la comunicación voluntaria entre las dos partes de la llamada telefónica, escucha o capta por su cuenta lo con- versado por esas dos partes, sin el consentimiento de éstas.

En el caso de autos, como el asunto concreto que nos concierne es la intervención de un supervisor de la A.E.E. en una conversación entre un cliente y otro empleado de la A.E.E., no puede decirse propiamente que existía aquí el "tercero" que es necesario de ordinario para que se configurase una interceptación telefónica ilícita. Como hemos visto antes, el supervisor en cuestión no era de modo alguno un tercero, extraño a la comunicación entre el cliente y el representante de servicio. Era más bien un **doble** del representante de servicio; una especie de **alter ego** de éste; otro instrumento de la A.E.E., semejante al que atendió la llamada telefónica en cuanto a su capacidad para actuar a nombre y por la A.E.E., y que servía para el mismo fin. Para los propósitos de la llamada, eran la misma persona.

Más importante aun, cuando un cliente de la A.E.E. llamaba a dicha entidad por conducto de un empleado de ésta, su intención evidente era que intervinieran respecto al asunto planteado por dicho cliente todos aquellos empleados de la A.E.E. que debían intervenir para que dicho asunto se atendiera adecuadamente. El cliente obviamente sabía, porque había sido avisado de ello, que su planteamiento podía ser referido a otros funcionarios de la empresa con autoridad para intervenir. Su llamada no tenía el propósito meramente de relacionarle al asunto en cuestión al particular representante de servicio que la atendió. No era una llamada personal a éste. Al hacer el cliente las llamadas en cuestión a la A.E.E. evidentemente estaba **consintiendo** de modo tácito a que lo comunicado fuese divulgado a todos aquellos en la A.E.E. que tenían injerencia respecto al asunto planteado por el cliente que llamó a la A.E.E. Por ello el cliente no tenía ninguna intención o expectativa de que lo conversado con tal representante habría de quedar sólo entre ellos dos. Todo lo contrario, **como consecuencia inevitable de la naturaleza de la A.E.E. como entidad corporativa**, y del aviso que le daba la propia A.E.E., el cliente estaba de acuerdo en que su conversación telefónica se transmitiese y divulgase a otros en la

---

[3] Véase, además, <u>E.L.A. v. P.R. Telephone Co.</u>, 114 D.P.R. 394 (1983).

empresa a quienes les correspondía atender el asunto que dicho cliente había planteado mediante su llamada telefónica. En este sentido, pues, no podía configurarse aquí una interceptación ilícita de la llamada del cliente por el mero hecho de que un supervisor la escuchase. **No sólo dicho supervisor no era un "tercero" que interceptase la llamada sino que, además, el cliente había consentido a que interviniese en la llamada**.

Ahora bien, lo señalado antes respecto a que no se configuraba aquí una violación al derecho consagrado en la Sección 10 del Art. II de la Constitución con respecto a las conversaciones telefónicas referidas de un cliente con empleados de la A.E.E., parte del supuesto esencial de que lo escuchado por dichos empleados habrá de utilizarse únicamente para darle la consideración debida al asunto concreto que el cliente trajo a la atención de la A.E.E. Lo comunicado por el cliente al representante de servicio está sujeto a ser revelado a otros funcionarios de la A.E.E., y aun a determinados terceros, sólo en la medida en que ello sea necesario para tramitar y atender propiamente el asunto planteado por dicho cliente. **Hasta ahí llega la identidad funcional entre el representante de servicios y los otros funcionarios de la A.E.E.; hasta ahí llega el consentimiento prestado por el cliente en tales llamadas**. Cualquier otro uso de la comunicación del cliente por la A.E.E. requeriría el consentimiento "patente, específico e inequívoco" del cliente sobre dicho otro uso. Ello, porque cualquier otro uso de la comunicación del cliente rebasaría la identidad de los funcionarios de la A.E.E., y el consentimiento del cliente a que lo conversado fuese divulgado a otros en la A.E.E. sólo a los fines de atender adecuadamente el propósito de la llamada telefónica. En situaciones como las del caso de autos, la identidad referida y el consentimiento del cliente que origina una llamada telefónica están limitados por la naturaleza misma de tal llamada. No se extienden más allá de la razón o propósito por el cual el cliente hizo la llamada en cuestión. Siempre queda el derecho residual de intimidad del cliente de

que lo conversado no se divulgará más allá de lo que requiere la finalidad de la llamada en cuestión. En situaciones como las del caso de autos, pues, por analogía podría decirse que el cliente conserva una expectativa razonable de intimidad de que la otra parte en la comunicación, aquí la A.E.E., no ha de revelar o utilizar lo conversado más allá de lo necesario para tramitar y atender propiamente el propósito de dicha comunicación.

De lo señalado antes se desprende concretamente que la A.E.E. podía utilizar supervisores que escucharan la conversación del cliente con el representante de servicio, como medio para resolver o darle una respuesta expedita al asunto concreto planteado por el cliente. También podía hacerlo como medio para mejorar los servicios de la A.E.E. al abonado, o para perfeccionar el desempeño del representante de servicio en su función de atender las llamadas de los clientes. **Cualquier otro uso requeriría otro acto de consentimiento claro y consciente del cliente o abonado**.

En el caso de autos no se ha alegado que la A.E.E. haya utilizado su sistema de auditoría de llamadas telefónicas más allá de los propósitos legítimos del cliente al hacer las llamadas en cuestión. Por ello, resolvemos que en el caso de autos no se ha violado el derecho a la intimidad que asiste a los clientes de la A.E.E. en situaciones como las que aquí nos concierne.

VI

Para concluir la consideración del asunto ante nos, debe atenderse otro aspecto particular de éste. En casos como el de autos podría configurarse otro tipo de interceptación telefónica ilícita, diferente a la que es normativamente lo más común. Como se sabe, poco después de adoptarse por el pueblo la Constitución del Estado Libre Asociado, el 10 de junio de 1953 se aprobó en Puerto Rico la Ley Núm. 66, vigente aún, con el propósito de darle apoyo penal al mandato de la Sec. 10 del Art. II de nuestra Constitución que prohíbe la interceptación no consentida

de las comunicaciones telefónicas. Dicha legislación se aprobó para imponer sanciones penales a la violación del mandato constitucional. La Ley Núm. 66 referida reflejaba el entendido contemporáneo que existía en el país sobre el alcance de dicho mandato constitucional. Pueblo v. De León Martínez, 132 D.P.R. 746, 751-752 (1993).[4] En el Art. 3 de la Ley Núm. 66, 33 L.P.R.A., Sec. 2160, se dispuso:

> Ninguna persona que participe en una comunicación telefónica ni ninguna otra persona extraña a la misma, grabará ninguna comunicación telefónica, mediante ningún procedimiento mecánico, ni permitirá que dicha comunicación sea oída por ninguna persona, por medio de una extensión del teléfono, o por cualquier otro medio, a no ser con el consentimiento expreso de todas las partes que intervienen en dicha comunicación telefónica. (Enfasis suplido).

Es evidente que conforme a dicho Art. 3, puede configurarse una interceptación telefónica ilícita no sólo en la situación común, cuando un tercero se inmiscuye en la llamada, sino además cuando alguna de las dos partes de la propia comunicación telefónica la **graba** sin el consentimiento

de la otra, **o permite que dicha comunicación sea oida por terceros mediante una extensión o cualquier otro medio** sin el consentimiento de la otra parte. Este Art. 3 de la Ley Núm. 66 alude, pues, a otras instancias de la interceptación telefónica prohibidas por la Sec. 10 del Artículo II de nuestra Constitución. En consecuencia, cada una de las partes en una llamada telefónica tiene derecho a que su conversación con la otra parte no ha de ser grabada por ésta, ni transmitida por ésta a terceros extraños a la conversación, mediante extensiones del teléfono o otros medios similares, sin su consentimiento. Puede configurarse una interceptación telefónica ilícita, pues, no sólo en la situación ordinaria en que un tercero, extraño a la conversación, la escucha o capta por su cuenta sino también cuando alguna de las mismas partes de la conversación la graba, o permite que terceros la escuchen, sin el consentimiento de la otra.

---

[4] Véase, además, la opinión concurrente del Juez Presidente Trías Monge en P.R. Tel. Co. v. Martínez, supra, a la pág. 357.

En el caso de autos, el foro de instancia discutió en su dictamen la posible **grabación** por la A.E.E. de una llamada de un cliente suyo sin el consentimiento de éste. Dicho foro, sin embargo, no concluyó en sus determinaciones de hecho que hubo tal grabación, ni ello se menciona en la estipulación de los hechos de las partes. No tenemos ante nos, pues, una alegación de que la A.E.E. en efecto haya **grabado** las llamadas en cuestión. No obstante, debe quedar claro de lo señalado antes en este acápite de la opinión que el aviso que la A.E.E. le daba a sus clientes en las situaciones impugnadas en el caso de autos no era suficiente para inferir que el cliente, al continuar con la llamada, había consentido también a que ésta se **grabase**. La información que se le proveía al cliente por la A.E.E. no permite concluir que el cliente tenía pleno conocimiento de que su inferida renuncia al derecho de intimidad incluía este extremo también. No puede decirse que consintió a que se grabase la llamada. La actuación del cliente, de seguir adelante con la llamada luego de escuchar el aviso referido, no configura una renuncia "patente, específica e inequívoca" de todo el derecho a la intimidad del cliente. No es claro que éste entendiese que estaba en efecto renunciando a todos los aspectos de su derecho a la intimidad. **Ciertamente no puede inferirse que el cliente haya consentido tácitamente a que se grabase su llamada**. Para grabar las llamadas aludidas, o para usarlas de algún modo que exceda los propósitos que tuvo el cliente al hacer tal llamada, la A.E.E. tiene que dar aviso previo de ello a sus abonados, más precisos que los que ha utilizado hasta ahora, a fin de permitir que haya una renuncia esclarecida por el cliente de su derecho a la intimidad con respecto a tales extremos.

VII

Al formular las pautas sobre el alcance del derecho de una persona a no sufrir una interceptación indeseada de sus conversaciones telefónicas que hemos anunciado antes en esta opinión, hemos tenido muy en cuenta las consideraciones de orden público sobre la protección del

derecho a la intimidad en el mundo contemporáneo tan henchido de avances tecnológicos, que mencionáramos en Arroyo v. Rattan Specialties, supra, a las págs. 54-58. Vivimos en una época en la que los rápidos desarrollos tecnológicos presentan crecientes y continuos riesgos a la intimidad de las personas. Aspectos del quehacer cotidiano quedan irremediablemente registrados en los modernos mecanismos de comunicación que utilizan los propios individuos, las empresas y el Estado para atenderlos. Tales registros, por muchos que sean, son susceptibles de ser acopiados a través de los eficientes sistemas de compilación de información que la cibernética ha hecho posible. Los múltiples actos y transacciones que una persona realiza a diario van dejando así una estela de numerosos rastros que pueden recopilarse electrónicamente para configurar un perfil de la vida privada de la persona, que terceros extraños pueden tratar de usar entonces para toda clase de fines. Y así, junto con las muchas y variadas formas de vigilancia que la tecnología ha hecho posible, la intimidad del ser humano se encuentra cada día en mayor peligro de perderse o quedar intolerablemente menoscabada.

Los cambios tecnológicos, claro está, tienen valores positivos importantes e innegables. Ofrecen medios más eficaces de realizar labores legítimas de los individuos, las empresas y el Estado. Por ello, encaramos la necesidad de armonizar el fundamental derecho a la intimidad, cuya protección nos es ineludible, **en todas sus vertientes**, con los beneficios valiosos de la tecnología moderna. Como dijimos en Arroyo v. Rattan Specialties, supra, "tenemos el deber de canalizar los desarrollos tecnológicos y científicos de forma tal que derivemos sus beneficios sin que se le aseste un golpe mortal a lo más preciado en la vida de todo ser humano en una sociedad democrática: su dignidad, integridad e intimidad".

En el caso de autos, hemos intentado establecer el balance propio entre los intereses legítimos contrapuestos, pautando los límites del uso válido del sistema de auditoría impugnado ante nos.

VIII

En resumen, con arreglo a los hechos estipulados por las partes, no podemos resolver que carece de validez constitucional el sistema de auditoría de llamadas telefónicas que se ha impugnado en el caso de autos. No surge de dicha estipulación que la A.E.E. grababa las llamadas en cuestión. Tampoco surge que la A.E.E. usaba dicho sistema para fines que fuesen más allá de los propósitos legítimos consentidos por los clientes que llamaban. Un sistema como el de autos podría ser contrario al mandato de la Sec. 10 del Art. II de nuestra Constitución, no por las razones señaladas por el foro de instancia que fueron expresamente acogidas por referencia por el foro apelativo, sino por las que hemos pautado en esta opinión. Pero no están presentes aquí ninguna de las situaciones de invalidez referidas, por lo que debemos concluir que no tenían razón los recurridos en ninguno de sus planteamientos.

Por todo lo anterior, se dictará sentencia para dejar sin efecto las del foro de instancia y del foro apelativo.


JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Unión de Trabajadores de la
Industria Eléctrica y Riego,
Janice L. Morales Figueroa,
Roberto Guevara Santiago,
et al

                              CC-1998-324    Certiorari

    Recurridos

       v.

Autoridad de Energía
Eléctrica, etc.

    Peticionarios

     Opinión Concurrente del Juez Asociado señor Negrón García

San Juan, Puerto Rico, a 13 de octubre de 1999

I

Dos factores distantes se unen para servir de trasfondo circunstancial a esta controversia. <u>Primero</u>, el constante reclamo del ciudadano por una mejor eficiencia en los servicios esenciales que presta el gobierno central, municipios, agencias, corporaciones, etc., frente a una burocracia gerencial, administrativa y laboral, que muchas veces, se percibe ineficiente por ser impersonal, esto es, innominada e inaccesible.

<u>Segundo</u>, los avances en el campo de las comunicaciones telefónicas con el desarrollo de unos medios más sofisticados. Al teléfono tradicional de

líneas conectadas por una "primitiva" red de alambres, se añadió el sistema multiplicador de fibra óptica. Siguieron los teléfonos inalámbricos, los celulares, la industria de llamadas-mensajes ("beepers"), los cuadros múltiples, la identificación de llamadas ("I.D. Caller"), el telefax, las llamadas conferencias ("conference call") que viabiliza conversaciones simultáneas entre más de dos personas, las grabadoras que automáticamente reciben y dan mensajes, etcétera. Hoy día existe el potencial de establecer un diálogo telefónico oral y escrito desde prácticamente cualquier lugar. Puerto Rico no ha estado ajeno a ese progreso; miles de personas dentro y fuera de la industria, banca y negocios privados y, el gobierno, agencias, corporaciones públicas y municipios -para una mejor calidad de vida y desempeño de sus operaciones- disfrutan diariamente de la magia de esas telecomunicaciones instantáneas.

**La aplicación de esta nueva tecnología, frente a los mecanismos clásicos de comunicación, genera natural y ocasionalmente conflictos e interrogantes jurídicas de lo que es permisible bajo las normas constitucionales y legales vigentes. Es legítima pues, la preocupación de que su utilización irrestricta pueda representar el peligro de una sociedad "Orweliana", en particular una amenaza sobre el fundamental derecho a la intimidad,[5] cuya esencia se inspira en el principio humanitario de que la dignidad personal es inviolable y, por ende, todo individuo es acreedor a ser protegido "contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar." <u>Art. II, Secs. 1 y 8, Constitución del E.L.A.</u> Su importancia es tal, que reinvindicarlo judicialmente no precisa legislación habilitadora; opera <u>ex propio vigore</u>.[6]**

Se trata de un derecho intrínsecamente personalísimo, no absoluto, pues sólo es susceptible de ser invocado por quien en determinado escenario circunstancial tiene una expectativa real de que su reclamo de intimidad se respete y, <u>a la par</u>, la sociedad la reconozca como legítima y razonable.[7]

**Se acepta que aunque las mencionadas Secs. 1 y 8 de nuestra Carta de Derechos limitan lo que puede el Estado hacer para salvaguardar e**

---

[5] <u>E.L.A.</u> v. <u>Hermandad de Empleados</u>, 107 D.P.R. 250 (1978); <u>P.R. Telephone Co.</u> v. <u>Martínez</u>, 114 D.P.R. 328 (1983); <u>Arroyo</u> v. <u>Rattan Specialties</u>, 117 D.P.R. 35 (1986).

[6] <u>Colón</u> v. <u>Romero Barceló</u>, 112 D.P.R. 573 (1982).

[7] <u>Pueblo</u> v. <u>Luzón</u>, 113 D.P.R. 315 (1982); <u>E.L.A.</u> v. <u>P.R. Telephone Co.</u>, 114 D.P.R. 394 (1983).

imponer el orden público sin violar el derecho ciudadano a la intimidad, no prohiben tajantemente la intromisión en la vida privada si es un imperativo resultante de una investigación o procedimiento criminal. **De sus textos se desprende que, como regla general,** la protección constitucional es contra la  intromisión abusiva o irrazonable.[8]

En lo pertinente al caso de autos, la Sec. 10 del Art. II contiene una veda específica a los efectos de que "[n]o se interceptará la comunicación telefónica". Como regla general, hay interceptación cuando un tercero subrepticiamente, utiliza aparatos o dispositivos electrónicos, mecánicos, o de otra índole para inmiscuirse o escuchar una conversación que sostienen dos personas a través de las líneas telefónicas. Pueblo v. Colón Rafucci, res. 25 de enero de 1996, 139 D.P.R. ___ (1996).

En P.R. Telephone Co. v. Martínez, supra, describimos sus contornos y ubicación dentro de nuestro esquema constitucional. Primero, la cláusula de interceptación telefónica, por propia naturaleza, pertenece a la esfera del derecho a la intimidad consagrado en la Sec. 8 y forma parte integral de la misma. Segundo, la Sec. 10, aunque aislada, no representa un derecho distinto al derecho a la intimidad en sí, sino que es una de sus manifestaciones. Tercero, su prohibición expresa refleja que los constituyentes tuvieron la intención específica de vedar la intromisión no consentida en las comunicaciones telefónicas. Pero, al igual que otros derechos es renunciable.

## II

Con el objetivo de contrarrestar el impersonalismo burocrático antes aludido y mejorar sus servicios utilizando esta nueva tecnología, los ejecutivos de la Autoridad de Energía Eléctrica establecieron el Centro de Servicios al Consumidor, que funciona como importante enlace

---

[8] Pueblo v. Santiago Feliciano, res. en 9 de noviembre de 1995, 139 D.P.R. ___ (1992).

telefónico con los abonados sobre asuntos relacionados con el servicio esencial que dicha entidad presta.[9]

El Centro se subdivide en tres áreas: pagos por Correo; Correspondencia y Teléfonos. En el área de Teléfonos se reciben llamadas de los clientes sobre los más variados asuntos rutinarios y urgentes, a saber: problemas con las cuentas, facturación, quejas, emergencias situacionales de peligro, apagones, desenganches de árboles, informes de robo de servicio, etc. Sus empleados están asignados individualmente a unidades de teléfonos en los cuales reciben las llamadas y entablan comunicación con los abonados que usan dicho cuadro telefónico.

En el caso de autos, dentro de sus prerrogativas gerenciales, la Autoridad concluyó que era necesario escuchar las llamadas oficiales (no personales) que se recibían en el Centro como método de supervisión para mejorar la calidad de sus servicios y, a la vez, evaluar el readiestramiento de los empleados allí asignados o posibles reclasificaciones de sus plazas.

De ordinario, en el ámbito laboral, no detectamos violación constitucional per se, como condición de empleo en la tarea funcional de operar un sistema de auditorías de llamadas no personales o alguno otro

---

[9] La respetable tesis mayoritaria visualiza que la parte receptora de las llamadas es la Autoridad de Energía Eléctrica como ente corporativo. Bajo esta premisa, sus empleados, como representantes de dicha entidad corporativa, no son titulares del derecho a que no se intercepten llamadas telefónicas. De esta forma se elimina de la ecuación a la Autoridad como **tercero**, fundiendo a sus empleados, supervisores y a la Autoridad en una misma y sola persona jurídica. Aunque se concluye que no existe propiamente un tercero -de modo que no puede configurarse una interceptación-, como alternativa a ese análisis, se utiliza el examen de expectativa razonable de intimidad.

En P.R. Telephone Co. v. Martínez, supra, decidimos que "[b]ajo la política pública constitucional vigente, a menos que haya una **renuncia** patente, especifica e inequívoca, el Estado no puede inmiscuirse el la comunicación. Salvo esto, el derecho a la intimidad en inviolable y el Estado, una entidad particular, o cualquier ciudadano están impedidos, sin otras excepciones, de interceptar o permitir que se intercepte o escuche una comunicación telefónica." Pág. 343. Ese mismo método analítico se sigue con relación a los abonados: no existe tercero y no hay expectativa razonable de intimidad en cuanto a la comunicación por ellos originada.

Por vía distinta llegamos al mismo resultado mayoritario. Bajo P.R. Telephone Co. v. Martínez, supra, la auditoria de llamadas telefónicas no conflige con las referidas disposiciones constitucionales.

**parecido al de autos. No es condición patronal arbitraria ni irrazonable tal asignación entre los deberes y funciones de un empleo, aún cuando ello incidentalmente conlleve la renuncia a determinado derecho constitucional. Múltiples solicitudes de empleo público y privado, requieren exámenes médicos, evaluaciones psicológicas, y divulgar, investigar y confirmar información estrictamente privada. En la rama judicial, ciertos funcionarios que actúan directamente bajo un Juez, están obligados por los Cánones de Ética Judicial y otras normas de conducta, limitativos del ejercicio de los derechos constitucionales de asociación y expresión. (Canon 11 de Ética Judicial).**[10]

**Bajo este prisma evaluamos el caso de autos. De los documentos admitidos en evidencia**[11] **surge** incontrovertidamente **que desde julio de 1988**[12] **los empleados que se desempeñaban como representantes de servicio del Centro fueron informados que sus funciones estarían integradas al mecanismo de auditoría de llamadas telefónicas.**

> **Los términos de las comunicaciones gerenciales aludidas fueron claros.** No se instaló el sistema subrepticiamente. Desde sus inicios los empleados conocieron su propósito legítimo en la prestación de los servicios normales de la Autoridad. **Ante esta realidad, ciertamente aquellos empleados que tenían reparo u objeción a desempeñar** esa nueva tarea **—bajo la pretendida hipótesis de que ello incidía en su derecho constitucional a la intimidad—, muy bien pudieron plantearlo y la gerencia, por tratarse de una nueva metodología en las funciones, adoptar discrecionalmente la alternativa de relevarlos de esa encomienda y trasladarlos a otras tareas.** No surge de los autos que empleado alguno manifestara su oposición al implantarse por primera vez el sistema de auditorías y viabilizar el curso de acción alterno aludido. **Concluimos que inequívocamente aceptaron prestar esa tarea receptora**

---

[10] Finkin, Matthew W., Privacy in Employment Law, Bureau of Nat. Affairs, Inc., (1995).

[11] Memorando de Consulta jurídica de la A.E.E. sobre "Monitoreo de Llamadas Telefónicas", 20 octubre de 1987; Comunicación a Representantes de Servicio, 15 julio de 1988; Comunicación a Supervisores de Servicios por Teléfono, 30 agosto de 1990; Comunicación a todo el Personal Unidad de Servicios por Teléfono, 15 enero de 1991; y Memorando a Representantes de Servicio, 18 de mayo de 1993.

[12] En contestación a una carta cursada por los Representantes de Servicio del Centro de Servicios al Consumidor, la A.E.E. explica que el error que se cometió al grabarse el mensaje para los abonados sobre la posibilidad de que la llamada podía ser escuchada por un supervisor, había sido corregido.

**en llamadas oficiales y la gerencia de la Autoridad no infringió disposición constitucional alguna.**

**III**

Lo expuesto no dispone nuestro análisis, pues, **para convalidar una interceptación telefónica es necesario se configure una** renuncia bilateral, **es decir, una aceptación tanto del originador como del receptor.**

**Los peticionarios son o fueron empleados de la Autoridad que ocuparon puestos como representantes de servicios en el Centro. El 18 de noviembre de 1993** comparecieron e invocaron en su demanda la calidad dual de empleados-abonados, para cuestionar la "práctica [que] se realiza desde hace tiempo". **Oportunamente las partes estipularon que hasta el 20 de agosto de 1995, las personas y clientes que originaron llamadas a la Autoridad —y tenían que esperar que se desocupara un Representante de Servicio—, escuchaban un anuncio grabado que decía** "Para mejorar la calidad del servicio, su llamada será escuchada por un supervisor. Cualquier duda, si necesita, solicite la atención de un supervisor." Sin embargo, cuando habían empleados disponibles para atenderla inmediatamente, el cliente no escuchaba mensaje alguno antes de que fuera atendido. Como resultado, en esas situaciones particulares la llamada era escuchada sin advertencia alguna al abonado.

**Puede apreciarse, que durante ese tiempo el sistema mensaje grabado** tenía la deficiencia constitucional **de que** algunas llamadas **fueron escuchadas sin la advertencia previa de que ante cualquiera duda se solicitara la atención (intervención) de un supervisor.**

**Aún así, la causa de acción de los peticionarios en su condición de abonados es improcedente.** Conocían **del sistema de auditorías, y aunque ocasionalmente llamaran desde sus hogares al Centro y no escucharan el mensaje antes mencionado,** no pueden pretender que para la concesión de un remedio obviemos ese conocimiento, y por ende, la configuración de una renuncia implícita al originar sus llamadas.

**Valga aclarar que a partir del 20 de agosto de 1995, con el nuevo sistema de cuadro telefónico, los clientes** siempre **han escuchado el**

**siguiente mensaje:** "Para poder brindar un mejor servicio un supervisor podría estar escuchando su llamada. Cualquier duda, si necesita, solicite la atención de un supervisor." **Se eliminó así la posibilidad de que una conversación fuera escuchada sin advertencia previa y el consentimiento necesario.**

Ante estas realidades no cabe el reclamo de daños y perjuicios, como tampoco el <u>injunction</u> solicitado; éste último por haberse convertido la reclamación en académica.


ANTONIO S. NEGRÓN GARCÍA
**Juez Asociado**

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

**Unión de Trabajadores Industria Eléctrica y Riego (UTIER)**

 Demandante

  Vs.      CC-1998-324  Certiorari

Autoridad de Energía Eléctrica (AEE)

 Demandado

Opinión Disidente emitida por el Juez Asociado señor Hernández Denton

   San Juan, Puerto Rico, a 13 de octubre de 1999.

   **Este recurso nos presenta la oportunidad de contestar la siguiente interrogante, ¿es constitucional un sistema de auditoría de llamadas mediante el cual la gerencia de la Autoridad de Energía Eléctrica escucha las llamadas entre sus empleados y clientes sin el consentimiento de dichos empleados?**

   **Por considerar que dicho sistema constituye una interceptación de una comunicación telefónica, y que los titulares de la protección constitucional no renunciaron a dicha protección, disentimos.  Distinto a la Opinión de este Tribunal, confirmaríamos la Sentencia del Tribunal de**

Circuito de Apelaciones, y declararíamos que el sistema de auditoría de llamadas impugnado en este recurso viola nuestra Constitución.

I.

Con el propósito de evaluar la calidad de los servicios al cliente, la Autoridad de Energía Eléctrica ("la Autoridad") estableció un sistema de auditoría de llamadas en el Centro de Servicios al Cliente ("Centro de Servicios"). En virtud de dicho sistema, ciertos oficiales y supervisores de la empresa pueden escuchar las llamadas entre los clientes y los empleados respecto a problemas con cuentas, informes de robo de servicio, facturación excesiva, quejas de servicio, etc. Los oficiales y supervisores deciden discrecionalmente cuáles llamadas escuchar, y al así hacerlo no informan a, o solicitan el consentimiento de los empleados que atienden al público.

Los consumidores que llaman al Centro de Servicios son advertidos del uso del sistema de auditoría de llamadas a través del siguiente mensaje: "*Para poder brindar un mejor servicio un supervisor podría estar escuchando su llamada*".  Este mensaje lo escuchan los abonados de la Autoridad antes de ser atendidos por un representante de servicio.[13]

Los empleados fueron informados del sistema de auditoría de llamadas cuando comenzaron a laborar en el Centro de Servicios en enero de 1993.  Además, en julio de ese mismo año se les prohibió que utilizaran las líneas telefónicas del Centro de Servicios para llamadas personales.[14]

---

[13] El mensaje que escuchan los clientes que llaman a la Autoridad no es el mensaje *original* que utilizó dicha entidad al implantar el sistema de auditoría. El mensaje original, vigente desde enero de 1993 hasta agosto de 1995, era: "*Para mejorar la calidad del servicio su llamada será escuchada por un supervisor. Cualquier duda, si necesita, solicite la atención de un supervisor*". Además, dicho mensaje original no era escuchado por *todos* los clientes que llamaban a la corporación pública.  Durante la vigencia del mismo, los *únicos* clientes que lo escuchaban eran los que *no* eran atendidos inmediatamente, y que tenían que esperar que un representante de servicio se desocupara.

[14] Entre enero y julio de 1993, los empleados recibían llamadas personales por el teléfono del Centro de Servicios, y también por otro teléfono separado que no está incluido en el sistema de auditoría. Desde julio, las llamadas personales se pueden atender sólo en el teléfono referido que no forma parte del sistema de auditoría.

Oportunamente los empleados presentaron una demanda contra la Autoridad en la que alegaron que el sistema de auditoría de la Autoridad viola la prohibición de interceptar comunicaciones telefónicas de nuestra Constitución, y solicitaron una sentencia declaratoria, un entredicho preliminar y otro permanente, y compensación por los daños alegadamente sufridos.

El Tribunal de Primera Instancia, Sala Superior de San Juan (Hon. Carmen R. Vélez Borrás), mediante una sentencia bien fundamentada declaró que el mecanismo de auditoría de llamadas de la Autoridad constituye una interceptación telefónica, al amparo del Art. II, Sec. 10 de la Constitución del Estado Libre Asociado de Puerto Rico. 1 L.P.R.A. (1982). Dicho foro concluyó que para escuchar las llamadas entre los abonados y los empleados de la Autoridad se requería el consentimiento tanto de los empleados como de los clientes de la Autoridad. Entendió el tribunal de instancia que los clientes y los empleados de la entidad demandada no dieron su consentimiento a la interceptación, por lo que se violó la Constitución.

Inconforme, la Autoridad acudió al Tribunal de Circuito de Apelaciones, Circuito Regional de San Juan, panel integrado por su Presidenta la Juez Fiol Matta, y las Juezas Rodríguez de Oronoz y López Vilanova. Dicho tribunal confirmó la sentencia del tribunal de instancia.

Insatisfecha con tal determinación, la Autoridad acudió ante nos mediante *certiorari*, y nos solicita la revocación de la sentencia del Tribunal de Circuito de Apelaciones. La Opinión mayoritaria revoca la sentencia recurrida y resuelve que, ante los hechos de este caso, los empleados no tenían una expectativa de intimidad sobre sus comunicaciones telefónicas en el trabajo y, por lo tanto, no hubo una interceptación inconstitucional de sus llamadas.

II.

El derecho a la intimidad está consagrado en Puerto Rico en las Secs. 1, 8 y 10 del Art. II de nuestra Constitución. 1 L.P.R.A.  La

trascendencia de dicho derecho es tal que opera por su propia fuerza y vigor, y se puede hacer valer entre partes privadas. Colón v. Romero Barceló, 112 D.P.R. 573, 576 (1982); Figueroa Ferrer v. E.L.A., 107 D.P.R. 250, 259 (1978). La Sección 10 del Art. II de la Constitución provee, en lo pertinente a este recurso, que "[n]o se interceptará la comunicación telefónica". Hemos dicho anteriormente que el derecho de una persona a que no se le intercepte la comunicación telefónica no es uno distinto al derecho a la intimidad, sino que es una de sus manifestaciones. P.R.T.C. v. Martínez, 114 D.P.R. 328, 340-41 (1983). La prohibición constitucional bajo discusión "es parte esencial del derecho mayor a la protección de la ley contra ataques abusivos a [la] honra, reputación y vida privada o familiar" dispuesto en la Sec. 8 del Art. II. P.R.T.C. v. Martínez, supra, pág. 341; 3 Diario de Sesiones de la Convención Constituyente de Puerto Rico 1586.

La Convención Constituyente redactó la cláusula de interceptación de comunicaciones telefónicas "mediante una prohibición *terminante* concebida en términos *definitivos no cualificados*". P.R.T.C. v. Martínez, supra, pág. 341. La intención de dicho ilustre cuerpo fue plasmar el ideal constitucional de mantener el derecho a la intimidad de *todo* ciudadano cuando utiliza las vías de comunicación telefónica, id., pág. 342, y hacer claro que el texto constitucional se interpretase de la manera más amplia posible en protección de la ciudadanía. José Trías Monge, Historia Constitucional de Puerto Rico, T. III, 1982, pág. 192. En armonía con esa realidad jurídica e histórica es que este Tribunal ha expresado que, bajo nuestro esquema constitucional, tanto el Estado, como una entidad particular, o cualquier ciudadano, están impedidos de inmiscuirse en las comunicaciones telefónicas de otras personas ya sea *escuchando, interceptando o permitiendo que cualquiera escuche o intercepte* una comunicación telefónica. Esta prohibición no admite excepciones. P.R.T.C. v. Martínez, supra, págs. 342-43.

El lenguaje utilizado por la Convención Constituyente en la redacción de este artículo, *exige* que para convalidar una interceptación telefónica exista una <u>*renuncia*</u> al derecho constitucional por parte de <u>*todas*</u> las personas que utilizan dicha vía de comunicación. <u>P.R.T.C. v. Martínez</u>, supra, pág. 342; <u>Pueblo v. Santiago Feliciano</u>, res. el 9 de noviembre de 1995, 139 D.P.R. __ (1995), escolio 16. De esta manera la Convención Constituyente rechazó que se pudiese escuchar o interceptar una comunicación telefónica mediante la renuncia de *una sola parte*, tal y como era bajo el estatuto federal vigente en aquel entonces. <u>P.R.T.C. v. Martínez</u>, supra, pág. 341.[15] La renuncia del derecho a la no interceptación telefónica, aparte de ser voluntaria, tiene que ser "patente, específica e inequívoca", aunque puede expresarse de manera explícita o implícita. <u>P.R.T.C. v. Martínez</u>, supra, pág. 342-43.

Reseñados los principios cardinales del derecho a la intimidad, en su manifestación de no interceptar comunicaciones telefónicas, examinemos la controversia del caso de autos.

III.

La Opinión mayoritaria concluye que no estamos ante una interceptación de una comunicación telefónica. Fundamenta su determinación en dos premisas. La primera es que el supervisor que escucha las referidas llamadas *no es un "tercero"* para propósitos de la prohibición constitucional sobre interceptaciones telefónicas, pues "la parte receptora en las llamadas telefónicas en cuestión, la que

---

[15] Bajo la ley federal todavía vigente, puede efectuarse una interceptación de una comunicación telefónica con el consentimiento de una sola persona que participe en dicha comunicación, si se cumplen ciertos requisitos. Véase el Título III del Omnibus Crime Control and Safe Streets Act of 1968, según enmendado, 18 U.S.C.A. § 2510 *et seq.*, § 2511(2)(d)(Sup. 1998).

No obstante, los estados y Puerto Rico pueden promulgar leyes que ofrezcan más protección a la intimidad que la que ofrece el estatuto federal citado. Matthew W. Finkin, <u>Privacy in Employment Law</u>, Washington, 1995, pág. 118. En Puerto Rico, por nuestra Constitución de factura más ancha, <u>E.L.A. v. Hermandad de Empleados</u>, 104 D.P.R. 436, 440 (1975), disfrutamos de protección adicional, ya que se requiere el

jurídicamente recibía tales llamadas, era la A.E.E. y no los empleados por conducto de los cuales dicha entidad actuaba".  La segunda premisa es que *no* existía *"expectativa de intimidad"* sobre estas llamadas porque "[c]omo no se trataba de llamadas personales de los empleados, no puede decirse que éstos tenían una expectativa de intimidad que les fuera violada".

Consideramos incorrectas ambas premisas, y contrario a la mayoría, entendemos que los empleados afectados no perdieron sus derechos constitucionales al aceptar un trabajo en el Centro de Servicios al Cliente.  Concluimos que el sistema establecido por la Autoridad constituye una interceptación inconstitucional de las comunicaciones telefónicas.

—A—

En primer lugar, la Opinión mayoritaria descansa en la premisa equivocada de que para determinar si hay una interceptación, se tiene que examinar si existe una expectativa de intimidad.

A diferencia de la cláusula contra registros, arrestos y allanamientos, que sólo prohibe los que sean *irrazonables*, Art. II, sec. 10, la cláusula sobre interceptación de comunicación telefónica se redactó de manera *categórica*.  La diferencia en la redacción de cada cláusula demuestra que la Convención Constituyente consideró que la prohibición a la interceptación de una comunicación telefónica debía de ser absoluta, distinto a los registros, arrestos y allanamientos, los cuales sí pueden efectuarse mediante orden judicial.

A tenor con lo dispuesto por la Convención Constituyente, este Tribunal afirmó en Pueblo v. Santiago Feliciano, supra, que la protección ofrecida por la cláusula constitucional prohibiendo la interceptación telefónica es de tal envergadura que no cede *ni aún ante una orden judicial*, a menos que medie el consentimiento de sus titulares.

---

consentimiento de *todas* la personas que intervienen en la comunicación telefónica para que la misma pueda ser interceptada.

Una enmienda que proveía específicamente que las interceptaciones telefónicas podrían efectuarse mediante orden judicial fue *expresamente* rechazada por la Convención Constituyente. 3 <u>Diario de Sesiones de la Convención Constituyente de Puerto Rico</u> 1581-1585; <u>P.R.T.C. v. Martínez</u>, supra, escolio número 1; Trías Monge, supra, pág. 192, escolio 148; y <u>Pueblo v. Santiago Feliciano</u>, supra. La enmienda fue sugerida por el Sr. Fernández Méndez, el cual era del criterio de que:

> "...*si en el recinto del hogar con la declaración jurada y la orden del tribunal se puede allanar el hogar, el Estado debe tener el derecho también de allanar los cables del teléfono y los cables telegráficos cuando cumple los mismos requisitos que cumple para allanar un hogar.*" 3 <u>Diario de Sesiones</u>, supra, págs. 1583-84.

En respuesta a la enmienda sugerida, el Sr. Reyes Delgado expresó, entre otras cosas:

> "...*[d]esde luego, la enmienda va dirigida a destruir el alcance de la garantía en cuanto respecta a la comunicación telefónica. Ahora, o se concede la garantía de manera que sea eficaz o no se concede...¡[s]i precisamente lo que hemos tenido en mente al disponer esto aquí, es que no estemos dando oportunidad a que en las cortes de justicia se sostengan casos con informaciones sobre intercepciones, lo que se llama wire tapping...de conversaciones telefónicas, donde hay que estar dependiendo del crédito que se le dé a una parte interesada [que testifica ante el (la) juez que expediría la orden]...*" 3 <u>Diario de Sesiones</u>, supra, págs. 1584-85.

> Por su parte, el Sr. Trías Monge expresó:

> "*En contra de la enmienda. Para indicar solamente que [e]n la proposición recomendada por la [Comisión de] Carta de Derechos, de adoptarse la enmienda sugerida por el compañero Fernández Méndez, quedaría destruido definitivamente el propósito de la misma.*" 3 <u>Diario de Sesiones</u>, supra, pág. 1585.

Al rechazar la enmienda, la Convención Constituyente dejó plasmada su clara intención de que cada cláusula constitucional tenga un alcance diferente y se analice de manera *distinta*. Por lo tanto, *antes de decidir el criterio de análisis a utilizar*, se tiene que identificar cuál es la cláusula constitucional aplicable.

Por un lado, la cláusula sobre arrestos, registros y allanamientos autoriza un análisis de "razonabilidad" al decidir si se violó dicha cláusula, y permite que se pueda efectuar dicha intervención mediando una orden judicial. El análisis de "razonabilidad" mencionado,

comprende un examen de la *expectativa de intimidad* de la persona objeto de la intervención impugnada, considerando los hechos particulares del caso. Véase, Ernesto L. Chiesa Aponte, <u>Derecho Procesal Penal de Puerto Rico y Estados Unidos</u>, Vol. 1, § 6.9, 1991, págs. 344-49; <u>Pueblo v. Santiago Feliciano</u>, supra; y <u>Pueblo v. Camilo Meléndez</u>, res. el 16 de junio de 1999, 99 TSPR 94.

En cambio, la cláusula prohibiendo la interceptación de la comunicación telefónica, redactada de manera categórica, no autoriza *ningún* tipo de interceptación, por "razonable" que sea; ni siquiera autoriza una interceptación mediante orden judicial, excepto si media el consentimiento de *todas* las partes en la comunicación. <u>Pueblo v. Santiago Feliciano</u>, supra; y <u>P.R.T.C. v. Martínez</u>, supra. Bajo esta cláusula no cabe hablar de "razonabilidad" al contestar si ha ocurrido una interceptación. *Por consiguiente, al contestar dicha interrogante, <u>no</u> se entra en el examen de la "expectativa de intimidad" que tienen las personas que se comunican telefónicamente.*

La Opinión mayoritaria, al recurrir al análisis de "expectativa de intimidad" cuando contesta la interrogante de si estamos ante una interceptación de una comunicación telefónica, ignora tanto la redacción clara que utilizó la Convención Constituyente, como el contexto histórico, socioeconómico y político que inspiró dicha cláusula.

-B-

Por otro lado, la mayoría también concluye que no estamos ante una interceptación porque los supervisores de la Autoridad que escuchan las llamadas <u>no</u> son "terceros" a la comunicación. Según la Opinión mayoritaria, dichos supervisores no son "terceros" porque las únicas "partes" en la comunicación telefónica son, por un lado el abonado y por el otro la Autoridad. Señala además, que el hecho de que del lado de la Autoridad haya dos (2) personas, una comunicándose con el cliente (el empleado), y *otra escuchando* (el supervisor), no altera el

resultado porque de cualquier manera la Autoridad es la "parte receptora" de la llamada.

Esta conclusión está basada en una ficción jurídica del derecho corporativo, la cual dispone como regla general que una corporación se considera legalmente una "persona" que actúa sólo a través de sus oficiales, empleados o representantes autorizados.  A ese tipo de persona se le conoce como "persona jurídica". William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations, Vol. 1, 1999 §§ 5 y 7, pág. 411 y 414, respectivamente; Vega v. Adm. Servs. Médicos, 117 D.P.R. 138, 146 (1986).

La ficción jurídica mencionada no se aplica automáticamente en toda interpretación legal. No puede considerarse a una corporación como "persona" si al hacerlo se desvirtúa el propósito y espíritu de la ley o constitución que se interpreta. Fletcher, supra, §§ 7.05 y 7.15, págs. 416 y 424, citando inter alia a Long v. Cooperative League of America, 140 N.E. 811 (1923), Personal Finance Co. of New York v. N.Y.U. Garage, Inc., 44 N.Y.S. 2d. 353 (1943), Country Motors, Inc. v. Friendly Finance Corp., 109 N.W. 2d 137 (1961), State Electro-Medical Institute v. State, 103 N.W. 1078 (1905), Divine v. Watauga Hospital, Inc., 137 F. Supp. 628 (1956) y Power Mfg. Co. v. Saunders, 274 U.S. 490 (1927).

La Opinión  mayoritaria desvirtúa el propósito y espíritu de nuestra Constitución cuando fundamenta su criterio de que no hay interceptación, en la "personalidad jurídica" separada de la Autoridad. Adoptar esta tesis significa que cada vez que una persona llame por teléfono a una corporación, o a cualquier entidad con personalidad jurídica propia, y entable una conversación con un representante de dicha entidad, otra persona, que no es el representante con el que está conversando, podría escuchar dicha llamada sin violar la Constitución. Bastaría con que la persona que escucha sea empleado de la entidad corporativa, y que la llamada esté dirigida a dicha entidad corporativa y no al empleado en su calidad personal.

Bajo la premisa del Tribunal en las circunstancias descritas, la persona que escucha no sería un "tercero" y no se configuraría entonces una interceptación. Por consiguiente, ni el cliente que llama a la corporación, ni el empleado de la corporación que conversa con dicho cliente, disfrutarían de la protección constitucional. El efecto de esta premisa es que, de ahora en adelante, las personas que utilicen nuestras vías de comunicación telefónica continuarán disfrutando de la protección constitucional, *excepto si dirigen sus llamadas a una corporación, o si se trata de empleados de una corporación cuyas labores incluyen atender llamadas dirigidas a dicha entidad.*

La Opinión mayoritaria tiene como resultado que la cláusula que antes protegía a *todo* ciudadano, y la cual no cedía *ni ante una orden judicial*, ahora se desintegra ante la aplicación inadecuada y desacertada de una ficción jurídica, sin que medie u*na renuncia al derecho constitucional* por parte de las personas que se comunican telefónicamente. Es insostenible concebir que la protección que diseñaron los miembros de la Convención Constituyente sea tan frágil.

En atención a principios básicos de interpretación constitucional[16], al historial legislativo, texto y jurisprudencia previa sobre la cláusula constitucional objeto de este pleito, somos de la opinión que dicha cláusula protege a *todas* las personas <u>naturales</u> que participan en una conversación telefónica.  Si dos personas *naturales* se comunican telefónicamente, aunque una sea empleado de una *corporación*, cualquier persona que *no sea una de estas dos personas naturales que se está comunicando*, será un "tercero" *para propósitos de este análisis constitucional.*[17]

---

[16] Véase sobre el tema de interpretación constitucional en nuestra jurisdicción a <u>Nogueras v. Hernández Colón</u>, 127 D.P.R. 405, 410-12 (1990).

[17] Aclaramos que bajo nuestra interpretación, se mantiene la protección constitucional de las "personas jurídicas".  Si se protege la comunicación telefónica de toda "persona natural", se protege automáticamente la comunicación telefónica de toda "persona jurídica", debido a que las personas jurídicas actúan a través de personas

Nuestra interpretación, contrario a la interpretación de este Tribunal, no hace *depender* la eficacia de la protección constitucional al *tipo de "persona"* que se llame (e.g., natural o jurídica), o a la *calidad* en la que la persona natural se comunique telefónicamente (e.g., como representante de una entidad, o como individuo).   Por el contrario, nuestra interpretación está en armonía con la intención de la Convención Constituyente y la normativa de este Tribunal de que dicha prohibición constitucional es terminante, y está redactada "en términos definitivos *no cualificados*", y con el ideal constitucional de extender el derecho a la intimidad *a todo* ciudadano que utiliza las vías de comunicación telefónica. P.R.T.C. v. Martínez, supra, págs. 341-42.

En el caso particular ante nos debemos también señalar que surge de los documentos que obran en autos, que la Autoridad contempló que como parte del sistema de evaluación de llamadas implantado, el mecanismo de auditoría de llamadas pudiera ser utilizado como un mecanismo de evaluación del trabajo y desempeño del empleado auditado. El Memorando de la Sra. Haydeé Rivera, Administradora del Centro de Servicios al Consumidor dirigido a los Representantes de Servicio del Centro de Servicios con fecha del 18 de mayo de 1993, les informó a dichos empleados que "*De surgir alguna situación en la evaluación de llamadas en que entendamos que pueda dar inicio a una investigación formal, así se lo informaremos, de manera que se protejan los derechos de todos los empleados*".

Así también,  mediante Memorando del 27 de enero de 1994, la Sra. Haydeé Rivera, Administradora del Centro de Servicios al Consumidor, y la Sra. Gladys Colón, Supervisora de Servicios al Abonado le comunicaron a la Sra. Nélida Olivo, Representante de Servicios por Teléfono, que, con el propósito de evaluarla como empleada temporera,

---

naturales. Fletcher, supra, Vol. 1, § 5, pág. 411.   Lo que no podemos refrendar en el caso de autos es la interpretación de que la "persona natural" del empleado de una corporación es absorbida por la personalidad jurídica de la corporación.

se dispusieron a auditar sus llamadas y encontraron que estuvo atendiendo una llamada personal **a través del cuadro por espacio de nueve minutos. Dicho memorando se unió al expediente personal de dicha empleada.**[18]

Dichos documentos demuestran que es insostenible el argumento mayoritario de que las únicas "partes" en la comunicación telefónica auditada lo eran el abonado y la Autoridad y que los supervisores no eran "terceros" a la comunicación. Como parte del sistema de auditoría implantado, la interceptación de las llamadas dirigidas a la autoridad, además de perseguir el ofrecer un mejor servicio a los abonados, pretendía servir como un mecanismo para la evaluación del desempeño profesional del empleado que fungía como representante de servicios. Correspodía al supervisor que auditaba las llamadas, de encontrar que el trabajo del empleado era insatisfactorio, tomar las medidas necesarias, ya fuese iniciar una investigación, o enviar un memorando al expediente personal del empleado. Ante esta situación de hechos es forzoso concluir que en representación de la Autoridad había dos "partes" en la comunicación, el representante y el supervisor, cuyos intereses en algunos casos podían estar encontrados.

Nos preocupa de sobremanera avalar un sistema de evaluación de empleados que descansa, en gran medida, en el monitoreo e interceptación de comunicaciones telefónicas en las que interviene dicho empleado.

Por todo lo anteriormente expuesto, concluimos que el supervisor de la Autoridad es un "tercero" para propósitos del análisis constitucional de este recurso.  La prohibición a la interceptación protege tanto a los empleados como a los clientes que llaman a la Autoridad, ya que esas son las  personas *naturales* que se comunican telefónicamente.

IV.

---

[18] Exhibit 5 y Exhibit 9.

En el caso de autos, la gerencia de la Autoridad le *comunicó* a los empleados demandantes que como parte de sus labores en el Centro de Servicios, estarían integrados al sistema de auditoría de llamadas.  De los hechos estipulados y de los documentos que obran en el expediente, no surge que los empleados renunciaron a su derecho constitucional de que no le interceptaran sus llamadas, o que dichos empleados fueran de alguna manera consultados, sea antes o después de su reclutamiento, sobre si autorizaban que se escucharan dichas llamadas.

Según hemos expresado, *sólo* si existe una "renuncia" al derecho a la no interceptación de comunicaciones telefónicas por todas las partes, es que puede convalidarse que el Estado, una entidad particular, o cualquier ciudadano escuche, intercepte o permita que se escuche o intercepte una comunicación de esta índole. P.R.T.C. v. Martínez, supra, págs. 343.   Dicha renuncia, aparte de ser voluntaria, debe ser una "patente, específica e inequívoca", y puede llevarse a cabo expresa o implícitamente. P.R.T.C. v. Martínez, supra, págs. 342-43.

La Opinión mayoritaria concluye que, ante los hechos de este recurso, los empleados "no eran titulares del derecho que establece la Sección 10 del Artículo II de nuestra Constitución".  Por dicha razón, ni siquiera ponderó discutir si los empleados demandantes renunciaron al derecho constitucional objeto de este recurso.

La Autoridad se limitó a *comunicar* a los empleados que sus llamadas serían interceptadas aleatoriamente. En sus comunicaciones internas, dicha agencia caracterizó el sistema de auditoría como "una labor de supervisión y del ejercicio ordinario de la discreción administrativa". Véase,  Exhibit Núm. 5. de la Oposición a Solicitud de Certiorari.

Es insostenible que meras comunicaciones de la gerencia sobre la implantación del sistema constituyan la renuncia "voluntaria, patente, específica e inequívoca" necesaria para renunciar el derecho a la no interceptación de comunicación telefónica.  Convalidar esta actuación de la Autoridad significa que un derecho de rango constitucional, que

no cede ni ante una orden judicial, se desploma ante un memorando
interno de una corporación pública.

En consideración a que una interceptación telefónica se convalida
sólo con el consentimiento de *todas* las partes envueltas, y a nuestra
conclusión de que en este recurso *una de las partes no consintió* a
dicha interceptación, entendemos innecesario pronunciarnos sobre si los
clientes de la Autoridad consintieron a la interceptación referida.

V.

Por los fundamentos expuestos, confirmaríamos la Sentencia del
Tribunal de Instancia, y la del Tribunal de Circuito de Apelaciones, y
declararíamos que la actuación de los supervisores de la Autoridad
impugnada en este recurso viola la cláusula de nuestra Constitución que
prohibe la interceptación de las comunicaciones telefónicas.
Emitiríamos además el interdicto permanente solicitado, y al igual que
el foro de instancia, concederíamos término a las partes para que
informen a dicho tribunal si se tiene que celebrar una vista
evidenciaria para determinar los daños sufridos, si alguno, por los
demandantes.

Nos resta expresar que al emitir este disenso, somos conscientes del
peligro que representa, para el disfrute de la libertad y de nuestro
sistema democrático, el mal uso de la tecnología por parte del Estado.
En 1949 George Orwell estremeció a sus lectores con su novela de
ciencia ficción Nineteen Eighty-Four, donde se describe una sociedad
futura que es víctima de la tecnología mal utilizada.  El siguiente
pasaje ilustra ese aterrador mundo futuro:

"...BIG BROTHER IS WATCHING YOU...

...There was of course no way of knowing whether you were being
watched at any given moment.  How often, or on what system, the
Thought Police plugged in on any individual wire was guesswork.
It was even conceivable that they watched everybody all the time.
But at any rate they could plug in your wire whenever they wanted
to.  You had to live—did live, from habit that became instinct—in
the assumption that every sound you made was overheard, and,
except in darkness, every movement scrutinized." George Orwell,
Nineteen Eighty-Four, 1949, pág. 4.

Este Tribunal abre hoy las puertas para que este caso sea el presagio de un futuro donde la sociedad descrita por George Orwell deje de ser ficción, y pase a formar parte de nuestra realidad.


                              FEDERICO HERNÁNDEZ DENTON
                              JUEZ ASOCIADO