EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Armando López Tristani<br><br>Recurrido<br><br>v.<br><br>Jeannette Maldonado Carrero<br><br>Peticionaria | Certiorari<br><br>2006 TSPR 143<br><br>168 DPR \_\_\_\_ |

Número del Caso: CC-2006-0271

Fecha: 8 de septiembre de 2006

Tribunal de Apelaciones:

        Región Judicial de Carolina

Juez Ponente:

        Hon. José M. Aponte Jiménez

Abogadas de la Parte Peticionaria:

        Lcda. Carmen Quiñones Núñez
        Lcda. Margarita Carrillo Iturrino

Abogados de la Parte Recurrida:

        Lcda. E. Ivonne Beltrán Silvagnoli
        Lcdo. Milton Vescovacci Nazario

Oficina del Procurador General:

        Lcda. Luana R. Ramos Carrión
        Procuradora General Auxiliar

Materia: Divorcio

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Armando López Tristani

    Recurrido

       v.

                             CC-2006-271

Jeannette Maldonado Carrero

    Peticionaria

Opinión del Tribunal emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 8 de septiembre de 2006

Corresponde preguntarnos si la peticionaria alberga un derecho a la intimidad sobre una grabación en videocinta, tomada sin su consentimiento, la cual expone imágenes suyas al desnudo, de modo que corresponda la devolución del vídeo a pesar de haber sido consignado en el tribunal por acuerdo transaccional suscrito por las partes en un pleito independiente al de autos. Acuerdo, que fue objeto de una sentencia por estipulación.

I

Los hechos incontrovertidos son los siguientes: El Sr. Armando López Tristani ("el recurrido") presentó demanda de divorcio y promovió

un proceso criminal de adulterio contra su esposa, la Sra. Jeannette Maldonado Carrero ("la peticionaria"),[1] luego de haber encontrado a ésta compartiendo con otra persona en el Apartamento L-101 del Condominio Castillo del Mar en Isla Verde. Al entrar al apartamento, el señor López Tristani, junto a su padre Armando López Ortiz y el detective privado Orlando Díaz ("los demandados"), grabaron en vídeo las escenas que contienen imágenes del cuerpo desnudo de la peticionaria y se marcharon del lugar.

A raíz de lo acontecido, la señora Maldonado Carrero instó una demanda sobre *injunction* preliminar y permanente. Alegó que los demandados entraron ilegalmente al apartamento localizado en Isla Verde, donde la peticionaria albergaba una expectativa de intimidad por ser un lugar privado propiedad de sus padres, el Sr. Efrén Maldonado Pascual y la Sra. Jeannette Carrero Carrero. Además, la peticionaria reclamó la violación de sus derechos fundamentales reconocidos en la Sección 8 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico por motivo de la grabación y reproducción del vídeo de su imagen, sin autorización para ello. **Solicitó, *inter alia*, una orden de cese y desista para evitar la utilización y reproducción del vídeo y una orden para la devolución a su persona del original y todas las copias que existieran del mismo.**

---

[1] El Sr. Armando López Tristani presentó demanda de divorcio por la causal de trato cruel y adulterio.

Durante la vista de interdicto provisional,[2] las representaciones legales de ambas partes se reunieron y convinieron en corte abierta las siguientes estipulaciones, las cuales fueron presentadas al tribunal mediante moción a tales efectos e incorporadas a la sentencia dictada, a saber:[3]

A. Los codemandados López Tristani, Suárez Álvarez y Orlando Díaz declararon bajo juramento que del vídeo objeto de la presente demanda sólo existe un original y una copia.

B. **Los codemandados López Tristani, López Ortiz y Tristani de López consignarían el 30 de agosto de 2005 en sobre sellado en el caso de divorcio, Armando López Tristani v. Jeannette Maldonado Carrero, Civil Núm. F DI2005-0635 (301), el original del vídeo y su copia. Este acuerdo fue en efecto cumplido.**

C. La parte demandada se obliga a no utilizar el vídeo original, ni copia alguna del mismo en ningún proceso civil y/o criminal. En cuanto al proceso criminal en contra de la parte demandante, el demandado López Tristani hará las gestiones con la fiscalía para que no se utilice el vídeo como prueba.

D. En vista de estos acuerdos, la parte demandante desiste con perjuicio de la acción contra los codemandados López Tristani, López Ortiz y Tristani de López.

---

[2] Surge de la Minuta de la vista 29 de agosto de 2005 que el tribunal de instancia, luego de reunirse en cámara con los abogados de las partes, expresó que "[l]amenta haber hecho la digresión (sic) porque ciertamente no entiende que hay actitud ni ambiente entre las partes y sus abogados para ningún grado de racionalidad ni objetividad para manejar este asunto. Señala que de la lectura de los documentos que obran en autos, le reflejan al tribunal que el incidente que se trae a la atención del tribunal es una consecuencia de una circunstancia mucha más amplia entre las partes aquí envueltas que debe mandatoriamente atenderse en otro foro de Relaciones de Familia, donde las partes pueden dilucidar sus problemas matrimoniales." Véase apéndice del recurso de *certiorari*, págs. 70-71.

[3] Véase Moción para que se dicte sentencia de conformidad con la Regla 35 de Procedimiento Civil presentada por la demandante Jeannette Maldonado Carrero el 24 de octubre de 2005, apéndice del recurso de *certiorari*, págs. 8-9.

> No obstante, la parte demandante se reserva el derecho a presentar nuevamente la acción en contra de los codemandados, en el caso de que en algún proceso, sea civil o criminal que están pendientes o en cualquier otro que surja, o en cualquier lugar o publicación, se muestre o se utilice el vídeo objeto de esta acción, o las imágenes allí contenidas.
>
> E.  En cuanto a los codemandados Diosdado Suárez Álvarez y Orlando Díaz, la parte demandante desiste sin perjuicio.
>
> F.  Los codemandados Diosdado Suárez Álvarez y Orlando Díaz, quienes comparecieron al Tribunal sin representación legal, declararon bajo juramento, junto al codemandado López Tristani, ratificando los acuerdos reducidos a escritos en la presente moción. (Énfasis nuestro.)

Como resultado de lo anterior, el controversial vídeo y su copia se consignaron en el tribunal en un sobre sellado en el pleito de divorcio. La sentencia por estipulación dictada advino final y firme.

De forma coetánea, en el caso de divorcio, la señora Maldonado Carrero solicitó el desglose y la devolución del vídeo que había sido consignado en dicho pleito. Sostuvo que no existía razón para que el tribunal lo mantuviese bajo su custodia toda vez que el mismo no sería utilizado en ningún caso civil o criminal, incluyendo la denuncia presentada por adulterio. El señor López Tristani, por su parte, se opuso al desglose de los vídeos consignados, aduciendo que ello no formó parte del acuerdo a que llegaron las partes en la demanda de *injunction* instada por la peticionaria.[4]

---

[4] Mediante moción a tales efectos, la peticionaria reiteró sus planteamientos para la entrega del vídeo y, además, argumentó que su representación legal necesitaba el mismo para la preparación de su defensa en el procedimiento

Evaluados los planteamientos de las partes, el tribunal de instancia dictó una orden en la que dispuso, escuetamente, "que el vídeo aludido se mantendrá sellado y consignado en el tribunal." Véase, Orden del Tribunal de Primera Instancia de 7 de noviembre de 2005, apéndice del recurso de *certiorari*, pág. 16.

Inconforme con tal determinación, la peticionaria acudió al Tribunal de Apelaciones, el cual denegó la expedición del auto discrecional. En su resolución, el foro apelativo intermedio identificó la controversia a resolver como una de naturaleza contractual. Al así hacerlo, concluyó que el señor López Tristani había cumplido con las estipulaciones acordadas entre las partes y determinó que la devolución del vídeo no había sido pactada en el acuerdo transaccional.

Insatisfecha, la señora Maldonado Carrero compareció ante nosotros y sostuvo que erró el Tribunal de Apelaciones al no ordenar la entrega del vídeo y su copia, toda vez que en el balance de intereses, correspondía su devolución por haber sido obtenido de forma ilegal y en violación de los derechos de intimidad y de su propia imagen, además de que no sería utilizado en ningún litigio civil o criminal.[5]

---

criminal instado en su contra. Véase apéndice del recurso de *certiorari*, págs. 53-55.

[5] El error fue planteado por la peticionaria de la siguiente manera:

Erró el Tribunal de Apelaciones al resolver que no procedía la entrega del vídeo y su copia a la peticionaria bajo el fundamento de que ello no fue parte de las estipulaciones de las partes en el caso FPE 2005-0871. No obstante, no tomó en

Concedimos término a la parte recurrida para expresarse sobre el recurso de *certiorari* presentado y al Procurador General para que informara si el Ministerio Público tenía la intención de utilizar en evidencia el vídeo en controversia durante el juicio criminal. Contando con la comparecencia de ambas partes, con la del Procurador General, así como los autos originales en el caso de divorcio, estamos preparados para resolver y procedemos a así hacerlo.

## II

## A

En síntesis, la peticionaria alegó que, independientemente del acuerdo transaccional a que llegaron las partes, el vídeo y su copia le deben ser entregados debido a que la grabación de su persona se hizo sin su consentimiento en violación a su derecho a la intimidad y a su propia imagen. Indicó además que el vídeo constituye un ataque a su honra y su dignidad. Estima que estos derechos superan por mucho cualquier interés que pueda tener el recurrido en los mismos, o en que éstos permanezcan bajo custodia judicial. Sostiene, que mantener el vídeo y su copia bajo custodia judicial no cumple propósito alguno,

---

consideración que, en el balance de intereses, procedía su entrega a la peticionaria debido a que el vídeo fue obtenido de forma ilegal y en violación a los derechos de intimidad y al de la propia imagen, el mismo lo que contiene son imágenes de la peticionaria, no ha sido admitido como evidencia en el caso de divorcio y no será empleado ni admitido en el caso de divorcio ni en ningún otro litigio, civil o criminal, presente o futuro.

toda vez que no forman parte de la evidencia admitida o presentada en un caso ni pueden ser utilizados en algún procedimiento judicial que se interese instar en su contra. Los planteamientos de la peticionaria son esencialmente idénticos a los esgrimidos en el pleito de *injunction* instado, donde solicitó por primera vez la entrega de los controversiales vídeos.

Analicemos entonces los planteamientos de la peticionaria.

**B**

El acuerdo de transacción se rige en nuestro ordenamiento por lo dispuesto en los artículos 1709 y siguientes del Código Civil de Puerto Rico. 31 L.P.R.A. secs. 4821 *et seq*. Allí, este negocio se define como aquel acuerdo mediante el cual las partes, dando, prometiendo o reteniendo cada una alguna cosa, evitan la provocación de un pleito o ponen fin a uno ya comenzado, con el propósito de evitar los pesares que conllevaría un litigio. *Rivera Rodríguez v. Rivera Reyes*, res. 20 de junio de 2006, 168 D.P.R. ___, 2006 T.S.P.R. 103. *Igaravidez v. Ricci*, 147 D.P.R. 1, 5 (1988). Véase, Q.M. Scaevola, *Código Civil*, Reus, Madrid, España, 1953, Tomo XXVIII, pág. 246; L. Rivera Rivera, *El contrato de transacción*, Jurídica Editores, San Juan, Puerto Rico, 1998; S. Tamayo Haya, *El contrato de transacción*, Thomson-Civitas, Madrid, España, 2003.

Los elementos esenciales a este tipo de contrato son: (1) una relación jurídica litigiosa, (2) la intención de los contratantes de componer el litigio, es decir, de eliminar las controversias, y (3) las recíprocas concesiones de las partes. *Neca Mortg. Corp. v. A. & W. Dev. S.E.*, 137 D.P.R. 860, 870 (1995).

Existen dos clases de contrato de transacción, el judicial y el extrajudicial. *Neca Mortg.*, *supra*, págs. 870-871. El acuerdo de transacción judicial, como el que nos ocupa, es aquél en el cual las partes acuerdan una transacción luego de haber comenzado el pleito judicial y solicitan incorporar el acuerdo al proceso en curso poniendo fin así a la controversia que generó el litigio. La transacción judicial tiene para las partes autoridad de cosa juzgada, por lo tanto las partes "tienen que considerar los puntos discutidos como definitivamente resueltos, y no pueden volver nuevamente sobre éstos." *Neca Mortg.*, *supra*, pág. 872. Véase además, *Rivera Rodríguez v. Rivera Reyes, supra*.

Por su naturaleza jurídica compleja, el contrato de transacción debe interpretarse de forma restrictiva. *Sucn. Román Febres v. Shelga Corporation*, 111 D.P.R. 782, 789 (1981). Hemos señalado que ello obedece a variadas razones, entre las que se encuentra el hecho que las transacciones judiciales están "matizadas por . . . mutuos sacrificios de régimen excepcional en algunos aspectos y por tanto, no deben interpretarse con extensión sino restrictivamente." *Rivera Rodríguez v. Rivera Reyes,*

*supra*, pág. 17. Para determinar la intención de las partes contratantes se deben considerar los actos anteriores, coetáneos y posteriores al otorgamiento del contrato. Artículo 1234 del Código Civil, 31 L.P.R.A. sec. 3472; *Ramírez Senegal & Latimer v. Rojo Rigual*, 123 D.P.R. 161, 174 (1989).

De otra parte, la transacción solo comprende "los objetos expresados determinadamente en ella, o que, por una inducción necesaria de sus palabras, deban reputarse comprendidos en la misma." Artículo 1714 del Código Civil, 31 L.P.R.A. 4826. Véase además, *Citibank* v. *Dependable Ins.* Co., 121 D.P.R. 503, 514 (1988); *Negrón Rivera y Bonilla, Ex parte*, 120 D.P.R. 61, 74-75 (1987); *Sucn. Román Febres v. Shelga Corporation, supra*.

El segundo párrafo del Artículo 1714, *supra*, dispone que "[l]a renuncia general de derechos se entiende sólo de los que tienen relación con la disputa sobre [la cual] ha recaído la transacción". Este párrafo tiene el propósito principal de aplicar concretamente a la transacción las normas generales de la renuncia de derechos y de interpretación de contratos. Véase Scaevola, *op. cit.*, pág. 162; I. Sierra Gil de la Cuesta, *Comentarios al Código Civil*, Editorial Bosch, 2000, Tomo 8, pág. 103-106. Véase además, Rivera Rivera, *op. cit.*, sec. 3.2.1, pág. 46; Tamayo Haya, *op. cit.*, sec. 7, págs. 510-557.

Es un principio general que los derechos concedidos por las leyes, al igual que los de estirpe constitucional --como lo es el derecho a la intimidad--, son renunciables.

No obstante, para que se configure una renuncia válida al derecho constitucional a la intimidad, ésta tiene que ser patente, específica e inequívoca. A modo de ejemplo, en *P.R.T.C. v. Martínez Cardona*, 114 D.P.R. 328, 343 (1983), resolvimos que la persona que accede y solicita judicialmente que su teléfono sea interceptado "incuestionablemente renuncia al derecho constitucional que le brinda la Sec. 10."

En el caso de marras, la peticionaria reconoce la existencia del acuerdo de transacción y la sentencia dictada bajo los mismos términos. En la cual, como indicamos, se convino la consignación en el tribunal del vídeo en controversia y su copia, con el propósito de evitar su utilización en los procedimientos judiciales instados y de impedir la divulgación y utilización de dicha grabación. No obstante, sostiene como hemos ya apuntado, que tiene un derecho a que los vídeos se le entreguen habida cuenta que éstos contienen su imagen desnuda y fueron grabados sin su consentimiento, por lo tanto en violación a su derecho a la intimidad. Además, arguye que éstos carecen de valor forense alguno toda vez que no se utilizarán en procedimiento judicial alguno.

Para atender el planteamiento hecho por la peticionaria, debemos examinar primeramente si ésta está protegida por la garantía constitucional a la intimidad en las circunstancias de este caso para luego evaluar qué efecto tiene, si alguno, sobre su requerimiento, el acuerdo

transaccional que puso fin a la demanda de *injunction* instada por la peticionaria en contra del aquí recurrido.

**III**

Las Secciones 1 y 8 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico protegen el derecho fundamental a la intimidad y dignidad de las personas.[6] Reiteradamente hemos expresado que este derecho, componente del derecho a la personalidad, goza de la más alta protección bajo nuestra Constitución y constituye un ámbito exento capaz de impedir o limitar la intervención de terceros --sean particulares o poderes públicos—- contra la voluntad del titular.[7] Véase, *Castro Cotto v. Tiendas Pitusa, Inc.*, res. 9 de junio de 2003, 159 D.P.R. ___, 2003 T.S.P.R. 101 y casos allí citados. Véase además, De Ángel Yagüez, La Protección de la Personalidad en el Derecho Privado, 83 *Rev. Der. Priv. Notarial*, 1, 42 (1974).

El carácter privilegiado y la primacía del derecho nos ha motivado a reconocer que la protección a lo privado opera *ex propio vigore* y puede hacerse valer entre personas

---

[6] El derecho a la intimidad está expresamente consagrado en la Sección 8 del Artículo II de nuestra Constitución, el cual dispone que "[t]oda persona tiene derecho a [la] protección de [la] ley contra ataques abusivos a su honra, vida privada o familiar." Por su parte, la Sección 1 del Artículo II establece la inviolabilidad de la dignidad del ser humano como principio básico que inspira los demás derechos incluidos en la Carta de Derechos. *Vega Rodríguez v. Telefónica de P.R.*, 156 D.P.R. 584, 601 (2002)

[7] Véase, Rosa Velásquez, Panorama general del derecho a la intimidad, 72 *Rev. Jur. U.P.R.* 665 (2003); Colón Cortés, Reconstruyendo la casa de cristal: La responsabilidad civil extracontractual derivada de los daños ocasionados al derecho a la intimidad, 72 *Rev. Jur. U.P.R.* 695 (2003).

privadas, eximiéndolas así del requisito de acción estatal. *López Rivera v. E.L.A.*, res. 11 de julio de 2005, 164 D.P.R. ___, 2005 T.S.P.R. 102; *Vega Rodríguez v. Telefónica de P.R.*, 156 D.P.R. 584, 600-01 (2002); *Arroyo v. Rattan Specialties*, 117 D.P.R. 35, 64 (1986); *Colón Vda. de Rivera v. Romero Barceló*, 112 D.P.R. 573, 575 (1982); *E.L.A. v. Hermandad de Empleados*, 104 D.P.R. 436, 440 (1975). Tal protección es necesaria no tan solo para que se pueda lograr una adecuada paz social o colectiva, como hemos indicado en el pasado, *viz.*, *Arroyo v. Rattan Specialties, supra*, pág. 62, sino también, porque así logramos mantener una calidad mínima de la vida humana, al mantener un reducto de ésta fuera del alcance de terceros. "[L]a vida privada es esa esfera de cada existencia en la cual ninguno puede inmiscuirse sin haber sido invitado." F. Herrero Tejedor, *La intimidad como derecho fundamental*, Ed. Colex, Madrid, España, 1998, pág. 20.

Este derecho constitucional, cuya violación puede ser reivindicada mediante el recurso de *injunction* o mediante la correspondiente acción por daños,[8] impone a toda persona el deber de no inmiscuirse en la vida privada o familiar de los demás seres humanos. En el caso normativo, *Colón Vda. de Rivera v. Romero Barceló, supra*, ampliamos la protección al derecho a la propia imagen,[9] como una modalidad del

---

[8] *Colón Vda. de Rivera v. Romero Barceló*, 112 D.P.R. 573, 576 (1982); *P.R.T.C. v. Martínez Cardona*, 114 D.P.R. 328, 335 (1983); *E.L.A. v. Hermandad de Empleados, supra*, a la pág. 447.
[9] El Informe de la Comisión de la Carta de Derechos remitido a la Convención Constituyente expresó sobre la Sección 8

derecho a la intimidad, cuya violación puede acarrear una reclamación en daños. Allí señalamos que "[e]n virtud de este derecho toda persona puede oponerse a que se reproduzca su efigie o se obtengan pruebas fotográficas de la misma, por personas a quienes no haya concedido autorización expresa o tácita." 112 D.P.R., pág. 578. **La imagen propia constituye un atributo fundamental con el cual se individualiza socialmente a la persona; es decir, es parte de la identidad personal. Como tal, es digna de tutela por su estrecha relación con la intimidad de la persona como con su honor**. Véase, C. Fernández Sessarego, *Derecho a la identidad personal*, Editorial Astrea, Buenos Aires, Argentina, 1992, sec. 17, págs. 138-142; J. Santos Briz, *La responsabilidad civil*, Ed. Montecorvo, Madrid, España, 1993, vol. I, págs. 199-201.

Con gran acierto, Santos Briz apunta lo siguiente respecto el derecho a la propia imagen, citamos extensamente:

> **En virtud de este derecho toda persona puede oponerse a que se reproduzca su efigie o se obtengan pruebas fotográficas de la misma, por personas a quienes no haya concedido autorización expresa o tácita.** Se extiende la prohibición a reproducir la imagen de otro. . . y comprende no solo la publicación de la imagen sino también la confección . . . sin autorización cuando se oponga a legítimos intereses del afectado, **en**

---

que "[s]e trata de la inviolabilidad personal en su forma más completa y amplia [y que e]l honor y la intimidad son valores del individuo que merecen protección cabal, no sólo frente a atentados provenientes de otros particulares, sino también contra ingerencias abusivas de las autoridades...La inviolabilidad de la persona se extiende a todo lo que es necesario para el desarrollo y expresión de la misma." 4 *Diario de Sesiones de la Convención Constituyente* 2566 (1961).

**especial si según el objeto de la fotografía o el modo y la forma de su obtención resulta escandalosa o tuvo lugar contra a la voluntad conocida del perjudicado.** (Énfasis nuestro.)

J. Santos Briz, *Derecho de daños*, Ed. Revista de Derecho Privado, Madrid, España, 1963, pág. 178.

A pesar de ser el derecho constitucional a la intimidad de la más alta jerarquía en nuestro ordenamiento jurídico, no se concibe como un derecho absoluto que "vence a todo otro valor en conflicto bajo todo supuesto concebible". *E.L.A. v. P.R.T.C.*, 114 D.P.R. 394, 401 (1983). Así pues, ante una alegación de violación a la intimidad, "[l]a cuestión central [a resolver] es si la persona tiene derecho a abrigar, donde sea, dentro de las circunstancias del caso específico, la expectativa de que su intimidad se respete." *E.L.A. v. P.R.T.C., supra*, a la pág. 402. Para hacer tal determinación, es necesario que concurran dos elementos: (1) el subjetivo, mediante el cual el reclamante, según las circunstancias del caso, alberga una expectativa real de que su intimidad se respete y, (2) el criterio objetivo, es decir, si la sociedad considera razonable tener tal expectativa. *Pueblo v. Santiago Feliciano*, 139 D.P.R. 360, 384 (1995).

A la luz de la normativa antes expuesta, analicemos las controversias planteadas en este caso.

## IV

### A

Iniciamos nuestra discusión señalando que el Procurador General en su comparecencia informó que el caso

criminal en contra de la aquí peticionaria había sido sobreseído luego que el recurrido presentara, por derecho propio, una moción al tribunal informando que no tenía interés alguno en proseguir con el mismo, a lo que el Ministerio Público se allanó. El Tribunal de Primera Instancia, Sala Superior de Carolina, dictó sentencia en el caso criminal por adulterio, ordenando el archivo y sobreseimiento del mismo. Por tal razón, el vídeo que está en controversia en el presente caso no habrá de ser utilizado como evidencia en el caso criminal.

Por su parte, el señor López Tristani se opuso al desglose y entrega del referido vídeo, principalmente, bajo el fundamento que ello no formó parte del acuerdo de transacción que dio base a la sentencia por estipulación dictada en el caso instado por la peticionaria en su contra. Arguyó que la doctrina de actos propios y de la buena fe contractual apoya su posición. Además, sostuvo que la peticionaria no puede reclamar violación a su derecho a la intimidad pues él tiene un derecho de superior jerarquía, a saber: que su esposa le guarde fidelidad y no incurriera en la "causal de adulterio." Concluyó entonces que no corresponde el desglose y entrega del vídeo y su copia.[10]

---

[10] También alegó que la peticionaria carece de legitimación activa para reclamar una expectativa de intimidad en el apartamento propiedad de sus padres. Debido a la conclusión a la que llegamos en esta ocasión, es innecesario discutir ese planteamiento.

**B**

Indiscutiblemente, la grabación de la imagen desnuda de una persona sin su consentimiento, mientras se encuentra en un apartamento privado, se revela como una intromisión irrazonable con su intimidad y su honra. La peticionaria albergaba sin duda, en el lugar donde se encontraba, una expectativa real de que su intimidad iba a ser respetada; expectativa, a todas luces razonable. Esta expectativa de intimidad se antepone a los intereses articulados por el recurrido en este caso. Sostener lo contrario representaría un lamentable retroceso en la evolución vindicadora del respeto a la intimidad que ha caracterizado la trayectoria de este Tribunal.

La imagen desnuda de una persona constituye uno de los ámbitos más sagrados de la intimidad corporal. "El sentimiento profundo de discreción y de pudor que existe en el fondo de cada ser humano exige la protección de la vida privada. Sin ello no habría libertad . . . [L]a vida privada está en el corazón de la libertad." Herrero Tejedor, *op. cit.*, pág. 20.[11]

Ya en *Fulana de Tal v. Demandado A*, 138 D.P.R. 610 (1995), nos habíamos enfrentado a una controversia que giraba en torno a la entrega de unos vídeos que reflejaban

---

[11] Véase, L. J. Mieres Mieres, *Intimidad Personal y Familiar, Prontuario de Jurisprudencia Constitucional*, Ed. Aranzadi, Navarra, 2002, pág. 51. ("El acoso y el hostigamiento lesionan nuestra intimidad territorial porque hay un espacio vital, una distancia necesaria que solo pueden franquear legítimamente quienes deseamos. La invasión inconsentida de ese espacio vital perturba nuestra libertad.")

a las partes en ese caso sosteniendo relaciones sexuales, los que habían sido grabados por el demandado sin el consentimiento de las demandantes.   En dicho caso, aun cuando no discutimos el derecho a la propia imagen, resolvimos, ante un reclamo de la prensa de estar presente durante la presentación en evidencia de los vídeos, que los vídeos en controversia debían ser vistos en cámara para salvaguardar el derecho a la intimidad que cobijaba a las demandantes, frente al interés público de libre acceso a los procedimientos judiciales. Véase también, *Bonilla Medina v. P.N.P.*, 140 D.P.R. 294 (1996)(el derecho a la propia imagen cede ante el interés público de acceso a información); *Pérez vda. De Muñiz v. Criado Amunategui*, 151 D.P.R. 355, 371 (2000)("el derecho a la intimidad . . . no justifica la imposición de censura previa, máxima manifestación de la violación a la libertad de prensa.")

**La posición axiológica privilegiada del derecho a la intimidad nos lleva a rechazar toda acción tendiente a espiar, vigilar y hostigar aspectos íntimos de la persona**, como ha ocurrido en este caso. Aquí, como se señaló, el recurrido irrumpió en el apartamento en que se encontraba la peticionaria y sin su autorización, grabó sus imágenes desnuda. Es insostenible que los avances tecnológicos se utilicen en perjuicio del derecho a la intimidad que albergan las personas. Reiteradamente hemos advertido de nuestro rechazo a que los adelantos en la tecnología se utilicen en detrimento de la integridad personal, la intimidad y la dignidad individual de las personas. *Vega*

*Rodríguez v. Telefónica de P.R., supra*, a las págs. 607-608.  Véase además, Herrero Tejedor, *op. cit.*, pág. 24 ("es unánime la denuncia de que las nuevas tecnologías suponen un serio peligro para la intimidad.  La facilidad con que ésta puede verse hoy vulnerada va en aumento, a medida que avanzan, se perfeccionan y simplifican las técnicas de grabación, captación de imágenes, reproducción y transmisión de datos, etc.")  En *Arroyo v. Rattan Specialties, supra*, pág. 56, indicamos correctamente lo siguiente:  "Debemos tratar de canalizar . . . los desarrollos tecnológicos y científicos, de forma tal que derivemos sus beneficios sin que se le aseste un golpe mortal a lo más preciado en la vida de todo ser humano en una sociedad democrática: su dignidad, integridad e intimidad."

Ahora bien, el derecho a la intimidad como todo derecho es renunciable.  En tal sentido hemos señalado que para que tal renuncia sea válida y eficaz tiene que ser "patente, específica e inequívoca."  *P.R.T.C. v. Martínez, supra*, pág. 343.  Es decir, la renuncia debe ser clara, voluntaria y efectuada con pleno conocimiento de causa. *UTIER v. AEE*, 149 D.P.R. 498 (1999); *Pueblo v. Morales Romero*, 100 D.P.R. 436 (1972).  Veamos entonces.

**V**

Como hemos visto, la peticionaria presentó una demanda de *injunction* en contra del recurrido solicitando vindicar su derecho a la intimidad ante la grabación de su imagen que efectuara éste en contra de su voluntad.  En la demanda

ésta solicitó no tan sólo que no se utilizara dicho vídeo en proceso judicial alguno o que no se reprodujera el mismo, sino también que se le entregara el mismo junto a cualquier copia hecha de éste. Durante este proceso, la peticionaria estuvo asesorada en todo momento por su representación legal. Como vimos inicialmente, en dicho caso las partes llegaron a un acuerdo transaccional para así finiquitar la controversia planteada en el caso y se acordó, de forma voluntaria, que el vídeo y su copia se consignaran en el tribunal. Surge del expediente que el tribunal de instancia cuestionó bajo juramento a las partes sobre los términos del acuerdo transaccional, cerciorándose de que estaban conforme con lo estipulado. Luego de lo cual dictó sentencia por estipulación la cual advino final y firme.

La peticionaria no nos ha adelantado argumento alguno que nos permita concluir que no fue su intención ponerle fin a la disputa de los vídeos mediante la consignación de los mismos, sellados, en el tribunal. Cualquier reclamo que ella pudiese tener sobre la tenencia de los vídeos, fue abandonado una vez consintió válidamente a que éstos fuesen consignados en el tribunal como parte de la transacción a que llegó con el aquí recurrido en el pleito de *injunction* que instó. Ésta no puede ahora relitigar un asunto que fue objeto ya de la sentencia por estipulación y que hoy es final y firme. Además, nada hay en el récord que nos permita concluir que al llegar a dicho acuerdo, renunciando a sus reclamos de carácter constitucional, su renuncia fue

inválida por no ser voluntaria, clara, o sin conocimiento de lo que acordaba. Repetimos, la peticionaria estuvo asesorada en todo momento por su representante legal y fue cuestionada sobre los términos acordados por el foro primario.

De otra parte, estimamos que al estar los vídeos consignados en sobre sellado en el tribunal fuera del acceso de terceros, su intimidad queda resguardada. El tribunal de primera instancia deberá tomar las medidas cautelares que estime necesarias para cerciorarse de que así sea. Los mismos deberán permanecer en bóveda por espacio de un año al cabo del cual, se procederá a la destrucción de éstos conforme el procedimiento establecido para la disposición de expedientes judiciales y la evidencia que forma parte de éstos. Véase, Reglas para la Administración del Programa de Disposición de Documentos de la Rama Judicial.

En esta coyuntura debemos expresar nuestra discrepancia con la Opinión disidente y su valoración del contrato de transacción. En ésta se indica que la causa del acuerdo transaccional fue "lograr que la peticionaria desistiera de la acción de interdicto que había presentado", por lo que "[l]a consignación de los vídeos no era la finalidad del negocio acordado entre las partes, sino una de las condiciones accesorias a la causa contractual." Opinión disidente, pág. 5. A base de lo anterior se sostiene que la "consignación era la prestación a la cual se obligaron el recurrido y los demás

codemandados en la acción del interdicto. La peticionaria no se obligó a consignar, sino que consistió a que el recurrido lo hiciera." *Íbid*, pág. 6. Por lo que no cabe hablar que la peticionaria haya hecho concesión recíproca alguna como parte de este acuerdo transaccional; en su consecuencia, no se configuró renuncia a derecho constitucional alguno.

No compartimos esta visión fragmentada de qué constituye la causa en el contrato de transacción por estimar que la misma no se ajusta a la doctrina prevaleciente sobre su naturaleza y, además, porque valora erróneamente el acuerdo transaccional habido en este litigio. Nos explicamos.

La delimitación de la causa típica del contrato de transacción no es tarea fácil ni libre de controversia entre la doctrina. Hay sin embargo aparente unanimidad respecto aquella propuesta que sostiene que "la causa del contrato de transacción es la composición de la *litis* mediante una parcial renuncia a las recíprocas pretensiones." E. López Barba, *El contrato de transacción, su resolución por incumplimiento*, Ediciones Laborum, Murcia, España, 2001, pág. 78. Ello supone que las recíprocas prestaciones constituyen no tan sólo el medio esencial para el desarrollo de la causa del negocio transaccional, sino que éstas pasan a formar parte de la propia causa. En tal sentido, la profesora Tamayo Haya, en su obra sobre la transacción, señala lo siguiente: "[no] es lícito afirmar que la causa se centre en el poner fin a una

controversia, sino que debe complementarse necesariamente con las recíprocas concesiones. . . . Es necesario siempre que ambas partes sacrifiquen y concedan al mismo tiempo alguna cosa en función de la superación del litigio sobre la cosa controvertida. . . . **En conjunto, el litigio y las recíprocas concesiones constituyen los elementos de la causa.**" (Énfasis nuestro.)   Tamayo Haya, *op. cit.*, pág. 210.

De igual manera se expresa la profesora López Barba, cuando apunta, citamos:

> Si bien el acuerdo de recíprocas concesiones es esencial para la perfección del contrato de transacción, no hay que olvidar que no es el único elemento de su causa, . . ., **la causa del contrato de transacción la constituye de un lado el conflicto inicial de intereses cualificado que la provoca, de otro, el acuerdo de recíprocas concesiones que le sirve de medio y, por último, la voluntad de autocomponer el conflicto por las propias partes, afectadas, con el fin de dar término al proceso judicial en curso o evitar que éste dé comienzo.**

López Barba, *op. cit.*, pág. 78.   Véase además, M. Albaladejo García, *Derecho Civil*, Ed. Bosch, Barcelona, España, tomo II, vol. II, 10ma ed., 1997, pág. 404; R. Ruggiero, *Instituciones de Derecho Civil*, Ed. Reus, Madrid, España, tomo II, vol. I, 1977.   En igual sentido, STS 30 marzo 1950 (A. 573); STS 10 junio 1968 (A. 3179); STS 21 octubre 1977 (A. 3904); STS 31 enero 1985 (A. 210).

El conflicto inicial en este caso se generó, claramente, por la grabación en vídeo de la imagen desnuda de la peticionaria y la utilización que a los referidos vídeos se le daría.   Como hemos discutido, el acuerdo

transaccional en este caso pretendió ponerle fin al pleito de *injunction* instado, generado por la controversia inicial que mencionamos.

Las partes en el litigio, para autocomponer el conflicto, acordaron las siguientes recíprocas concesiones: la peticionaria renunció a su reclamo sobre los vídeos, viz., que le fueran entregados pues la grabación de los mismos configuraba una violación a su derecho a la intimidad; y, el recurrido renunció a los derechos que alegaba le asistían sobre los mismos, así como a utilizarlos como evidencia en los procedimientos judiciales pendientes (el pleito de divorcio y el proceso criminal). En consideración a lo anterior, los polémicos vídeos se consignaron en el tribunal finiquitando así la controversia entre las partes. El conjunto de lo anterior constituye la causa del acuerdo transaccional convenido en este caso. Ciertamente, sin consignación no hubiera habido transacción alguna. La consignación no puede considerarse como un mero acto accesorio, sin ulterior consecuencia.

No podemos perder de vista que las recíprocas concesiones ejemplifican el principio de que toda transacción "supone sacrificios recíprocos, es decir, el abandono de una cosa, derecho o pretensión. . . Es necesario que cada uno de los contratantes reduzca y sacrifique a favor de otro una parte sus exigencias a cambio de recibir una parte de aquello objeto de litigio. . . Mueve por lo tanto, la transacción a cada una

de las partes a ceder algo de sus derechos." Tamaya Haya, *op. cit.*, pág. 141.[12]

La peticionaria renunció a su derecho a la intimidad al llegar al acuerdo transaccional que hemos discutido. Ésta abandonó su reclamo de intimidad a cambio que la parte demandada no retuviera los vídeos para sí y no los utilizara en los procedimientos judiciales pendientes en su contra al momento de acordar la transacción. Ello, como poco, constituye una inducción necesaria y lógica del acuerdo en cuestión.

En virtud de los fundamentos antes expresados, se expide el auto solicitado y se dicta sentencia modificando la sentencia dictada por el Tribunal de Primera Instancia, para que se tomen las medidas cautelares que se entienda correspondan, para cerciorarse que terceros no tengan acceso al vídeo objeto de la presente controversia. Se dispone además que transcurrido un año, se procederá con la destrucción de los vídeos conforme el procedimiento establecido para esos propósitos. Así modificada se

---

[12] Cabe destacar que aun cuando la ausencia de recíprocas concesiones supone que no nos encontramos ante una transacción verdadera por falta de causa, las concesiones no tiene que ser perfectamente equivalentes. La "reciprocidad no significa igualdad de los sacrificios consentidos. . . .[E]l móvil que determina la superación del conflicto puede determinar la desigualdad en las concesiones." S. Tamayo Haya, *El contrato de transacción*, Thomson-Civitas, Madrid, España, 2002, pág. 159. L. Rivera Rivera, *El contrato de transacción*, Jurídica editores, San Juan, Puerto Rico, 1998, pág. 45 ("Es importante recalcar que lo mismo pueden ser prestaciones aducidas en la controversia, que otro derecho no discutido. Tampoco es necesario que haya equivalencia entre las concesiones. Asimismo se ha reconocido que los sacrificios pueden ser de orden moral o tener contenido económico.") Véase además, STS 14 marzo 1955 (A. 765).

confirma la sentencia dictada.  Se devuelve el caso al foro primario para que actúe conforme lo aquí expresado.

Se dictará sentencia de conformidad.


                              Anabelle Rodríguez Rodríguez
                                    Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Armando López Tristani

    Recurrido

      v.

                        CC-2006-271

Jeannette Maldonado Carrero

    Peticionaria

SENTENCIA

San Juan, Puerto Rico, a 8 de septiembre de 2006

Por los fundamentos expuestos en la Opinión que antecede, los cuales se incorporan íntegramente a la presente, se expide el auto solicitado y se dicta sentencia modificando la sentencia dictada por el Tribunal de Primera Instancia, para que se tomen las medidas cautelares que se entienda correspondan, para cerciorarse que terceros no tengan acceso al vídeo objeto de la presente controversia. Se dispone además que transcurrido un año, se proceda con la destrucción de los vídeos conforme el procedimiento establecido para el decomiso de los mismos, y así modificada se confirma la misma. Se devuelve el caso al foro primario para que continúen los procedimientos conforme lo aquí expresado.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Fiol Matta emitió una Opinión concurrente y disidente.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Armando López Tristani

    Recurrido

        v.

Jeannette Maldonado Carrero

    Peticionaria

CC-2006-271    CERTIORARI

Opinión concurrente y disidente emitida por la Jueza Asociada SEÑORA FIOL MATTA

En San Juan, Puerto Rico, a 8 de septiembre de 2006.

La parte peticionaria comparece ante este Tribunal solicitando que revoquemos la sentencia del Tribunal de Apelaciones que determinó que no procedía la devolución de unos vídeos en la que aparece desnuda, debido a que ello no fue pactado en el acuerdo transaccional. La Mayoría de este Tribunal, al resolver la presente controversia, expone con gran claridad y acierto el carácter fundamental del derecho a la intimidad en Puerto Rico y cómo goza de la más alta protección constitucional. Sin embargo, confirma al foro apelativo y resuelve que el consentimiento de la peticionaria a la consignación de los vídeos en el tribunal como parte de una transacción implicaba, de

por sí, una renuncia válida a su derecho constitucional de intimidad respecto a éstos. Por mi parte, aunque concurro plenamente con las conclusiones a las que llega la Mayoría en cuanto a la extensión del derecho constitucional a la intimidad y dignidad de las personas, disiento de la determinación de confirmar la sentencia recurrida, por las razones que paso a exponer.

I.

El Código Civil de Puerto Rico, en su artículo 1709, define la transacción como "un contrato por el cual las partes, dando, prometiendo o reteniendo cada uno alguna cosa, evitan la provocación de un pleito o ponen término al que había comenzado". 31 L.P.R.A. sec. 4821. Como todo contrato, la transacción contiene como requisitos el consentimiento consensual de las partes, una controversia como objeto, y la causa que consiste en la eliminación de la controversia mediante concesiones recíprocas entre las partes. Neca Mortgage Corp. v. A&W Dev. S.E., 137 D.P.R. 860, 870-871 (1995). De esto es importante recordar, en cuanto al presente caso, que la finalidad del contrato de transacción es evitar el inicio de un pleito o ponerle fin a uno pendiente.

Como bien señala la Opinión de la Mayoría, por su naturaleza, el contrato de transacción debe interpretarse de manera restrictiva, limitando rigurosamente la exégesis contractual a lo expresamente señalado en sus disposiciones. Rivera Rodríguez v. Rivera Reyes, 2006 T.S.P.R. 103. Ello se debe a que las transacciones requieren de las partes "mutuos sacrificios de régimen excepcional". Id. Por esta razón, el artículo 1714 del Código Civil determina expresamente el

alcance que podemos darle a las disposiciones de una transacción y los límites de su objeto. Este artículo señala que este negocio "no comprende sino los objetos expresados determinantemente en ella, o que, por una inducción necesaria de sus palabras, deban reputarse comprendidos en la misma". 31 L.P.R.A. sec. 4826. Incluso podría ser necesario acudir a las normas generales sobre interpretación de contratos, particularmente las contenidas en los artículos 1233 a 1241 del Código Civil. 31 L.P.R.A. secs. 3471-3479. Véase Sucn. Román v. Shelga Corp., 111 D.P.R. 782, 789 (1981).

De particular importancia para los hechos de este caso es el segundo párrafo del artículo 1714 que dispone que "[l]a renuncia general de derechos se entiende sólo de los que tienen relación con la disputa sobre [la cual] ha recaído la transacción". 31 L.P.R.A. sec. 4826. Esta norma limita la interpretación que se le pueda dar a la renuncia de derechos. Como las transacciones suelen otorgarse durante circunstancias de tensión y con carácter complejo, el Código Civil establece que su interpretación debe ser lo más rigurosa posible, y a lo más que debe extenderse es a una "inducción necesaria" de las palabras. En cuanto a la renuncia de derechos, ésta debe ser limitada específicamente a la causa que dio lugar a la transacción. Incluso, se ha entendido que en la transacción "no cabe la renuncia abdicativa o declaración de voluntad por la cual el titular de un derecho se despoja de éste sin que exista *concesión recíproca*". (énfasis suplido) L.R. Rivera Rivera, El contrato de transacción: sus efectos en situaciones de solidaridad, San Juan, Ed. Jurídica Editores, 1998, pág. 46. Al respecto, Scaevola indica: "[u]na renuncia sin recompensa constituiría

una liberalidad y no una transacción". Q.M. Scaevola, Código
Civil: Comentado, Madrid, Ed. Reus, 1953, Tomo XXVIII, pág.
267.

La Mayoría de este Tribunal resuelve correctamente
que el derecho a la intimidad de la peticionaria se antepone
a los intereses articulados por el recurrido. Sin duda
alguna, la peticionaria tenía un derecho privilegiado, de
carácter constitucional, a que su intimidad y dignidad fuesen
respetadas y protegidas contra todo tipo de intromisión. La
imagen desnuda de la señora Maldonado Carrero forma parte de
la esfera privada de su persona e identidad que está
reservada y aislada de la convivencia genérica con los demás
miembros de la sociedad. Como algo propio de la
peticionaria, su imagen no puede ser cedida o controlada por
terceros a menos que ella lo autorice.

No obstante lo anterior, hemos resuelto que al igual que
otros derechos, los de carácter constitucional son
renunciables. Ahora bien, cuando se trata de derechos
fundamentales, como lo es el de la intimidad, surge una
presunción contraria a la renuncia. F.S.E. v. Comisión
Industrial, 105 D.P.R. 261, 265 (1976). Bajo nuestro
ordenamiento constitucional para que la renuncia sea válida
debe ser voluntaria, con pleno conocimiento de causa, expresa
y no presunta. También tiene que ser patente, específica e
inequívoca. U.T.I.E.R. v. A.E.E., 149 D.P.R. 498, 508
(1999); P.R.T.C. v. Martínez, 114 D.P.R. 328, 343 (1983);
Pueblo v. Morales, 100 D.P.R. 436, 439 (1972). De la renuncia
no cumplir con estos requisitos, el derecho a la intimidad es
incuestionablemente inviolable y permanece bajo el control de
su titular.

II.

La Mayoría de este Tribunal resuelve que la peticionaria renunció a sus reclamos de carácter constitucional sobre la tenencia de los vídeos, "una vez consintió válidamente a que éstos fuesen consignados en el tribunal como parte de la transacción". Opinión de la mayoría, pág. 19. De esa forma concluye que el acuerdo transaccional al que llegaron las partes para finalizar el pleito sobre interdicto provisional tuvo el efecto de una renuncia válida de la peticionaria a un reclamo de intimidad sobre los vídeos. Entiende que al consentir voluntariamente a la consignación de los vídeos, asesorada en todo momento por su abogado, la peticionaria también renunció específicamente y con conocimiento a ejercer cualquier derecho que pudiera tener sobre ellos.

Discrepo de esta conclusión. Debo destacar, primeramente, que la causa del acuerdo transaccional entre las partes era la de lograr que la peticionaria desistiera de la acción de interdicto que había presentado. La consignación de los vídeos no era la finalidad del negocio acordado entre las partes, sino una de las condiciones accesorias a la causa contractual. Debemos recordar que un negocio de transacción no debe interpretarse más allá de la controversia que dio lugar al pleito que se busca evitar o concluir. Las disposiciones contractuales de la transacción deben ser interpretadas restrictivamente.

Sin embargo, la opinión mayoritaria resuelve que el acuerdo de transacción hizo las veces de una renuncia válida a los reclamos constitucionales de intimidad de la peticionaria. A mi entender, esto no se desprende del

contrato, que sólo expresaba que la peticionaria desistía de la demanda de injunction y el recurrido se comprometía a no utilizar los vídeos. La Opinión de la Mayoría también entiende que el consentimiento a la consignación implicó una renuncia absoluta de la peticionaria a todo derecho sobre la imagen contenida en los vídeos, pero no podemos olvidar que no fue ella quien se obligó a consignar. El acuerdo disponía que "*los codemandados*. . . consignarían. . . en sobre sellado. . . el original del vídeo y su copia". (Énfasis nuestro) La consignación era la prestación a la cual se obligaron el recurrido y los demás codemandados en la acción del interdicto. La peticionaria no se obligó a consignar, sino que consintió a que el recurrido lo hiciera. Las circunstancias que rodean el acuerdo a lo sumo permiten concluir que la peticionaria permitió esto como una solución temporal al posible uso no autorizado que se le daría a los vídeos en las otras acciones judiciales.

Una interpretación restrictiva del acuerdo no nos puede llevar a concluir que la frase "desiste con perjuicio de la acción" y la aceptación de la peticionaria a que el recurrido consignara los vídeos reflejan una intención clara de renunciar a los derechos que la peticionaria pueda tener sobre los vídeos, tomados sin su consentimiento, en las que aparece desnuda. De una "inducción necesaria" de esta frase y de las prestaciones acordadas tampoco se desprende esta renuncia.

Por otra parte debemos recordar que la renuncia al derecho a la intimidad debe ser patente, específica e inequívoca, y que ante la ausencia de estos requisitos existe una presunción contraria a la renuncia. No surge de la

estipulación una patente renuncia al derecho de la demandante a los vídeos, mucho menos una específica e inequívoca. A mi entender, la renuncia ni siquiera es implícita, por lo que no puedo coincidir con la decisión de la Mayoría de asumir que la peticionaria renunció a los reclamos que pudiera tener sobre la imagen de ella desnuda. El resultado al que llega este Tribunal resulta aún más preocupante frente al inciso (D) del acuerdo de transacción:

> la parte demandante se reserva el derecho de presentar nuevamente la acción en contra de los codemandados, en el caso de que en algún proceso, sea civil o criminal que están pendientes o en cualquier otro que surja, o en cualquier lugar o publicación, se muestre o se utilice el vídeo objeto de esta acción, o las imágenes allí contenidas.

Esta disposición hace una reserva patente, específica e inequívoca de que la peticionaria puede reivindicar su derecho a la intimidad cuando sea amenazado por un uso no autorizado de los vídeos. Ante una reserva expresa de esta magnitud no podemos hablar de una renuncia al derecho a la intimidad en el caso de autos.

El recurrido no tenía derecho real alguno sobre los vídeos, siendo los mismos una intromisión irrazonable y no autorizada a la intimidad de la peticionaria. Por tanto, el compromiso a no utilizar los vídeos no puede ser equiparado a la alegada abdicación de la peticionaria a presentar cualquier reclamación reivindicatoria de sus derechos. Ante esta realidad, el Tribunal no podía reconocer la renuncia abdicativa de un derecho fundamental, pues no hubo una concesión recíproca.

Por último, debo expresar mi inquietud sobre el resultado práctico de este caso. El Tribunal impide que la peticionaria obtenga la posesión de los vídeos en los que

aparece desnuda, y respecto a los cuales tiene un derecho constitucional a tener y controlar, para que el tribunal de instancia sea quien los custodie "en sobre sellado", con miras a que la intimidad de la peticionaria "quede resguardada". Además, se le impone al tribunal la obligación de tomar medidas para que terceros no tengan acceso al vídeo. Esta obligación abre la puerta a posibles reclamos de la peticionaria si el tribunal no cumple a cabalidad con esta responsabilidad.

Por las razones expuestas, concurro con las expresiones de la opinión mayoritaria sobre la naturaleza y extensión del derecho a la intimidad y dignidad de las personas reconocido en nuestro ordenamiento constitucional, pero disiento del resultado al que llega la Mayoría de este Tribunal. Por las razones que he expuesto, revocaría la sentencia recurrida.

Liana Fiol Matta
Jueza Asociada